CLARK *v.* ULRICH.

*In re* MORE'S ESTATE.

1. SAVING QUESTIONS FOR REVIEW — EVIDENCE — OBJECTION — NECESSITY.
   Objections to the admission of the testimony of a physician, on the ground of privilege, not raised on the trial, will not be considered on appeal.

2. WILLS—MENTAL INCAPACITY—UNDUE INFLUENCE—EVIDENCE — SUFFICIENCY.
   In a proceeding to probate a will, contested on the grounds of mental incapacity and undue influence, evidence examined, and *held*, to be insufficient to take the questions to the jury, and that the court should have directed a verdict for proponents.

3. TRIAL—MISCONDUCT OF COUNSEL.
   It is improper for counsel to make statements of fact not in evidence during the examination of witnesses; for if counsel possesses any information relative to the facts, which he thinks should go to the jury, he should be sworn as a witness and subject himself to the rules governing the taking of testimony.

Error to Oakland; Hosmer, J., presiding. Submitted June 17, 1908. (Docket No. 61.) Decided July 13, 1908.

Adelia Clark and Thomas Hislop, executor, presented for probate the last will and testament of Huldah More, deceased. The will was allowed in the probate court, and Helen Ulrich and others appealed to the circuit court. There was judgment for contestants, and proponents bring error. Reversed.

*Edward E. Kane* and *Ignatius J. Salliotte*, for appellants.

*Brennan, Donnelly & Van De Mark* (*James H. Lynch*, of counsel), for appellees.

MOORE, J. This is a contest over a will, the material parts of which read as follows:

"1st. I direct the payment of my debts and funeral expenses and the erection of a suitable monument over my grave, out of my estate; said monument not to exceed in cost the sum of one hundred dollars, and I further direct that the sum of one thousand dollars be set aside, out of my estate, and invested and the income derived therefrom devoted to the care and ornamentation of my grave and burial lot.

"2d. I give and bequeath to my granddaughter, Helen Krumhorn, of Vernon, in the State of Michigan, the sum of three hundred dollars, and direct that the said sum shall be invested by the executors of my will, hereinafter named, in such manner as to them shall seem best, until she attains the age of twenty-one years, and in case of her death before she attains the age of twenty-one years, leaving issue surviving her, then to her said issue, and in case of her death before she attains the age of twenty-one years, without issue surviving her, then I direct that said sum, and the income thereof, shall go to my residuary legatee hereinafter named.

"3d. I give and bequeath to my grandson, Eddie H. Garrison, also of Vernon, in the State of Michigan, the sum of two hundred dollars, the same to be paid within three months after my death, and in case of his death before the time above mentioned for the payment of said

two hundred dollars, then I direct the same to be paid to his legal heirs.

"4th. I give and bequeath to my daughter Fidelia Whittaker, of the city of Detroit, aforesaid, the sum of three hundred dollars, the same to be paid within three months after my death, and in case of her death before the time above mentioned for the payment of said three hundred dollars, then I direct the same to be paid to her legal heirs.

"5th. I give and bequeath to my granddaughter Helen More, daughter of my deceased son, Charles W. More, and now of Waterloo, in the State of New York, the sum of two hundred dollars, and direct that the same shall be invested by the executors of my will herein named, in such manner as they think best, until she arrives at the age of twenty-one years, and in case of her death before she attains the age of twenty-one years, leaving issue surviving her, then to her said issue, and in case of her death before she attains the age of twenty-one years, leaving no issue surviving her, then I direct the same to go to her sister, Katie More, hereinafter named.

"6th. I give and bequeath to my granddaughter Katie More, also daughter of my deceased son, Charles W. More, and now of Waterloo, in the State of New York, the sum of two hundred dollars, and direct that the same shall be invested by the executors of my will herein named, in such manner as they think best until she arrives at the age of twenty-one years, and in case of her death before she attains the age of twenty-one years leaving issue surviving her, then to her said issue, and in case of her death before she attains the age of twenty-one years, leaving no issue surviving her, then I direct the same to go to her sister, Helen More, hereinbefore named.

"7th. In case of the death of both said Helen More and said Katie More, before either of them attains the age of twenty-one years, without issue surviving either of them, then and in such case, I direct that the aforesaid sums bequeathed to them shall go to my residuary legatee hereinafter named.

"8th. I give, devise and bequeath to William H. Clark, of Vernon, in the State of Michigan, and to his heirs forever, the north thirty-three feet of Outlot Nineteen, and the south half of Outlot Eighteen of the Guoin Farm, in the city of Detroit, Wayne county, Michigan, the same being the land owned by me on the east side of

Russell street, and north of Superior street, when said Superior street is extended east of Russell street and south of Willis avenue, in said city of Detroit, subject, however, to the payment of the said sum of one thousand dollars, set apart for the care and ornamentation of my grave and burial lot, and also subject to the payment of the legacies in my will hereinbefore named.

"9th. I give, devise and bequeath to my daughter, Adelia Clark, of Vernon, in the State of Michigan, and her heirs forever, all other and remaining property, both real and personal, of every name and nature, including my homestead and all moneys on deposit in banks, government bonds, and all other property belonging to me."

The will was allowed in probate court, an appeal was taken to the circuit court. The contestants are four of the children of the Fidelia Whittaker, named as a beneficiary in the will, who died in 1902, and two grandchildren, who at the time the will was made were named therein as Katie More and Helen More, the children of Charles W. More, deceased, Nellie Schmidt and E. H. Garrison, daughter and son of Sarah M. More who died in 1887. Nellie Schmidt is the person whose name at the time the will was made was Helen Krumhorn.

After the testimony was in, counsel asked the trial court to give the following request:

"*First.* The jury are instructed that there is no evidence in this case showing that Huldah More lacked testamentary capacity on July 19, 1889, when she made this will or that this will was the result of any undue influence exercised over Huldah More by Adelia Clark or William Clark, or either of them, or by anyone else by or on behalf of them or either of them, and they must therefore find a verdict that the will in question is the valid, legal will of Huldah More."

The court was also requested that in case he refused to give this request, to give certain other requests which were preferred by counsel and to submit four special questions to the jury. The trial judge refused to give the request above quoted. He also declined to give some of the other requests, and to submit one of the special questions. He

gave some of the other requests and submitted to the jury three of the special questions, which were answered by the jury against proponent's contention. The will was disallowed by the jury.

The proponents then moved the court for a new trial, because the verdict was against the weight of the evidence upon the question of mental competency, also upon the question of undue influence and for several other reasons. On overruling the motion for a new trial, the trial judge said:

"If there were nothing more in this case than the question of mental competency, I should have no hesitation in granting a new trial on the ground that the verdict was against the weight of evidence, but I cannot say there was not sufficient evidence to warrant the jury in finding the will was procured by undue influence."

The record is a voluminous one and there are a great many assignments of error. Every word of the record has been carefully read by the writer of this opinion, but it will not be necessary to set out in detail what it contains. The important question in the case is whether it should have been submitted to the jury at all. The will was made in 1889, when Huldah More was 78 years of age. She died in 1904, when she was 93 years of age. She left an estate of about $23,000 to $25,000 which consisted chiefly of Detroit real estate, and $8,000 of deposits in two banks in Detroit. William S. More, the husband of Huldah More, died in 1875. He was a market gardener. Previous to his death for a number of years he and his wife lived on and worked a tract of land on Russell street between Willis and Alexandrine avenues in Detroit. Just before the husband died he deeded to each of his five children one acre of land out of the above mentioned tract. The rest was deeded to his wife, Huldah More. Mrs. More continued the business of market gardening with the aid of hired help, she doing much of the work herself, for about fourteen years after her husband's death. After that she grew vegetables for her own use

and was a grower of flowers, which she sold. This continued until 1899, when she met with a severe accident while on a visit to her daughter Adelia, who lived at Vernon, in this State, which resulted in a broken hip. Until the time of this accident, with the advice of her counsel and the aid of hired help, she managed her property and transacted all her business herself.

William and Huldah More had a son whose name was Charles W. More; he was married in 1869; his wife left him under circumstances which will be referred to later. He was the father of two of the contestants, Helen Ulrich and Katherine More. He was granted a decree of divorce from his wife in 1885. He was a very bright man but was given to dissipation. After his wife left him, taking with her the children, he made his home with his mother until his death in 1887. The evidence discloses he died as the result of dissipation. Charles W. More left a personal estate of about $800. His mother was appointed first special and then general administratrix of his estate, and duly administered it to the satisfaction of the probate court.

Thomas Hislop, an attorney at law, was acquainted with Charles W. More in his lifetime and acted as the legal adviser of Mrs. More when she was managing the estate of her son. In the early part of July, 1889, Mrs. More called at the office of Mr. Hislop, alone, and told him she desired to make a will, and furnished him the data from which to draw a will. From this data Mr. Hislop drew the will and informed Mrs. More it was ready for her signature. On July 19, 1889, Mrs. More came to the office of Mr. Hislop and the will as prepared was read over to her. She discovered that Mr. Hislop had misunderstood the name of one of her grandchildren, Helen Krumhorn, and the name was corrected at her suggestion. Mr. Kane, an attorney at law, and the late W. M. Lillibridge, who later became circuit judge, were called in as witnesses, and in their presence Mrs. More executed the will, Mr. Kane and Mr. Lillibridge signing as witnesses.

Upon the hearing the deposition of Mr. Lillibridge was read in evidence. He expressed the opinion that Mrs. More was entirely competent to make the will. Mr. Kane and Mr. Hislop were both sworn upon the trial, and both were very positive in their statement that Mrs. More was competent to make the will. After the will was executed it was left with Mr. Hislop for several years, at the expiration of which time Mrs. More called at his office and got the will, saying she thought it would be safer in her private box in the safety vault of one of the banks where she did business, where it was found after her death, with her other papers.

The record discloses that in 1898 she negotiated a sale of part of her real estate, advising with her counsel, for $8,500. She received a down payment of $4,000 which she herself counted, fixed the terms and time of payment of the balance, executed a contract for the balance and later a deed. She had litigation with the city, appeared as a witness before committees of the common council, was complainant in an injunction bill, sworn to by herself, against the city, prosecuted litigation against it successfully, and made deeds to the city and others, after her will was made. She kept bank accounts and was frequently making deposits and withdrawals, and when she died there was standing in her name deposits amounting to more than $8,000.

Reference has been made to the fact that Charles W. More and his wife separated prior to 1885, when he obtained his divorce. His divorced wife was a witness in this case on the part of the contestants. Much of her testimony was immaterial, as it related to what occurred between her children and her husband. She testified that she was advised by Huldah More to leave her husband and "There was no disagreement between me and Huldah More during the time of my married life, we always visited back and forth," and that Huldah More told her Mrs. Clark thought she ought to deed back to her husband the land he had deeded to her, and that Mrs. More told her

upon another occasion that she could not help her then for the kindness she had shown her, but told her how she was going to dispose of her property among all the children. On the cross-examination she testified, among other things:

"I got the deed of the house and lot from my husband about two years after I was married and it was probably five or six years after that that Huldah More told me she wanted me to deed it back to my husband. My husband felt very much hurt because I did not deed it back and asked me to deed it back and I refused. His mother thought that I ought to deed it back. Mrs. More had been trying to get me to deed back the house and lot to my husband for perhaps a couple of years and I had constantly refused to do so and never did deed it back. Huldah More asked me several times to deed the house and lot back to Charles and showed considerable feeling about it. She felt hard because I refused to do it. I never talked with Adelia Clark on that subject at all, nor about taking my children and going home to New York before I left my husband. I have no knowledge of Adelia Clark's feeling in regard to my deeding this property back to my husband, except what Huldah More told me, and she told me just once that Mrs. Clark thought I ought to do so. It was just after Mrs. More came back from Vernon, after her fall, and that was in 1890 or 1889, that she told me that she could not help me then for the kindness I had shown her and told me what she was going to do with her property. I cannot tell the year that she returned after her fall."

Whatever else this testimony shows, it does show most clearly that Mrs. Huldah More thought her son Charles W. More had been greatly wronged by his wife when she procured a deed from him of his house and lot, and refused to deed it back.

We have already spoken of Fidelia More, Sarah More, and Charles W. More. The youngest child, Alfred More, was never married and died in 1877. The oldest daughter, Adelia, married Mr. Clark, and they moved to Vernon in 1855, and lived there until Mr. Clark's death in 1897, and Mrs. Clark lived there at the time of the trial. Huldah More was fond of her oldest daughter and visited her

occasionally, and it was while on a visit to her that Mrs. More was hurt. The record also discloses that Mrs. Clark made it a point to visit her mother upon her birthdays and at holiday time when she could.

Mrs. Clark's testimony was taken and appears in the record; she swore she never attempted to influence her mother in the making of the will, or the disposition of her property, and that she had no knowledge of the will or its contents until her mother's death. It is claimed that her testimony is contradictory in relation to her having a key to the box in the safety vaults, but there is no conduct shown upon her part that is inconsistent with the conduct of a loving daughter to her aged mother. She received visits from her and paid visits to her, and indicated an interest in the condition of her household, but there is nothing in her conduct in that regard that should be the subject of adverse criticism.

After the death of her son, Charles W., Huldah More lived alone with her hired help, except for the period from 1891 to December, 1896, when Nellie Schmidt lived with her, during which time Mrs. More gave Nellie a piano. It is claimed that Mrs. Clark advised her mother not to have Nellie come to live with her. The same witness said Mrs. Clark assigned as a reason that it would make too much work for her. Nellie at this time was about ten years old. Whatever Mrs. Clark may have said, it is apparent that it did not prevent Huldah More from having her grandchild with her, for, as stated above, she lived with her grandmother for about five years.

We come back to the question, Was there evidence which ought to have taken the case to the jury that Mrs. More was incompetent to make the will in July, 1889? Two doctors who had attended Mrs. More were sworn as witnesses. It is now said their testimony should not be considered, as it was privileged. This objection was not made in the court below and we decline to discuss it now. *In re Mansbach's Estate*, 150 Mich. 348.

One of the doctors said she was suffering from anæmia,

hysteria, partial hemiplegia and arteriosclerosis, and that these disorders would affect her mental capacity, when the following occurred:

"*The Court:* What peculiarities of mind did she exhibit at that time and circumstances?

"*A.* Well, one thing, she would talk about the amount of money she had in the bank, and another time she would talk about a certain granddaughter and her son, and whatever she talked about she seemed to be enthusiastic about it; she seemed to be full of impression. * * *

"The man Kraft worked for her a long time. At one time she would think him a lovely man; she didn't know what she would do if he was not in her employ and was full of enthusiasm about him; then another time she would find fault with him, she didn't know what to do about it. One time she would like him and then she would find fault with him. Every time I would come to her she would talk on some subject, one time one thing, another time another, but whatever she talked about, she seemed to be so full of enthusiasm, fully worked up upon it. Her eyesight was bad.

"*Q.* Now, doctor, after having read Exhibit 'B,' which purports to be the last will and testament of Huldah More, you may state whether or not, from your knowledge, at the time that the will was made, on the 19th day of July, 1889, she was in your opinion mentally competent to execute and plan this document?"

This was objected to, but the doctor was permitted to answer: "I should say that she certainly was not." On cross-examination he testified that he commenced the study of medicine at the Detroit College of Medicine in 1887, and was studying in that college in the fall of 1889, and graduated from the Michigan College of Medicine in 1892, and that when he first prescribed for Mrs. More he was a mere student, but said he had studied medicine in Canada, that he considered himself an expert practitioner before he graduated, and that he was testifying as an expert. He further said:

"She had anæmia, and as a result the brain was suffering in proportion. Any person suffering from cerebral anæmia is incompetent to make any will; I stick to that."

It further appeared, upon the cross-examination, that Mrs. More settled with him from time to time and insisted upon having a receipt each time.

The other doctor was called two or three times in consultation with the doctor whose testimony we have referred to. He also testified that he saw her frequently up to the time when she was hurt. The following is the substance of his direct testimony:

"I do not remember the cause of my first seeing her in 1889. No, I do not remember when I first saw her. I know I saw her with Dr. Castell. I could not say how often I saw her from that until 1900. Sometimes I would see her quite often, sometimes maybe it would be a month or two months without seeing her. * * *

"*The Court:* In the year 1889 at the time you first saw her?

"*A.* I would not like to say, your honor; I do not remember the date. I might not have seen her in 1889, possibly. I do not think it is hardly probable. I think I saw her in 1889. I looked up my books, I took my books, I saw them a few days ago. I can bring them with me, but I think in 1889 I got some calls upon her, but whenever they were, if they were in 1889 or 1890, then I had my opinion.

"Well, she was a lady 80 odd years old at that time and suffering from physical infirmities, physical condition that all people do at that age, with corresponding mental weakness. She had certain well-defined physical and mental conditions that made her at that time a partial invalid. She had a small heart, what we call an atrophied heart; that is, a heart not as large as it should be, and that gave her the condition we call anæmia, poor blood supply to different parts. She had stomach and intestinal trouble, bladder trouble. She had certain nervous troubles, as palsy—that is, when she would walk she would tremble; her arms, hands and lower limbs would tremble. She had some trouble with her hearing; it was defective and her eyesight was defective and she had certain weakness of the brain. * * *

"*Q.* What manifestations were there of mental weakness in her condition at the time you first saw her? * * *

"*A.* Well, several. She would complain of her head

153 MICH.—45.

aching—that she could not think; told me she could not remember and I have in giving her medicine told her how, in writing up a prescription to give to her for her medicine. I have not only told her how it was to be taken, and my directions I made as simple as possible, but I have even written them down and when I gave the medicine out of my case, I wrote it down on paper and left it there with the medicine on it—and she would forget how to take that medicine or she would take much more than I had ordered and she would do other things along the same line. For instance, one medicine which was to be taken at night she would take it in the daytime and when I would give her medicine to sleep, she complained of being unable to sleep and when I would give her directions about sitting in the—she gave me a history of the sun affecting her. She had not had a typical sunstroke, but the sun had affected her several times, by her history, and my directions to her were to keep out of the sun in the summer time; to keep in the shade and, if she did go out, to wear a sunbonnet or tie something wet inside of it to protect her head.

" At one particular time she told me she was obliged to go down town, said she was going and I coaxed her and begged her not to go down town, because it was in the middle of summer, and she had to go for some reason and I advised her then to have her attorney take care of the matter but she would not do it and I went so far as to send my carriage for her and take her and Mrs. Clark down street. She would have one opinion one day and maybe in a week she would change that. She would want to take medicine too fast at certain times and other times she would not want to take it as often as I thought was necessary. She would have her likes and dislikes of people, she would like a person today and maybe the next day you would go there she would not like that person, that same individual. And other times she insisted on my having my horse kept there on pasture in her lot.

"She had trouble with her eyes and I think I had her prepared to have her eye fixed, to have an eye specialist see her, several times. She had a cataract on one eye, I don't remember which it was, and I gave her medicine to relieve her of some symptoms she had that were due to that eye trouble, and I gave her medicine to prepare the eye for operation and she had been partially prepared for the operation several times and yet never had it operated upon. * * *

"*Q.* Now, doctor, having read the document known as Exhibit 'B,' which purports to be the last will and testament of Huldah More, state whether or not in your opinion, derived from your observations of this woman, she was mentally capable to comprehend and execute and plan that will at the time it bears date, July 19th, 1889 ?
"*A.* No; I would not think she was."

On the cross-examination he testified that he graduated from the Detroit College of Medicine in 1887; that he had a complete set of books at his office in 1887, 1888, and 1889; that it was possible he did not see her at all until 1891. Four bills were produced given by the doctor to Mrs. More. The first one was dated December 9, 1893; it stated: "Bills rendered the first of every month. To professional services in full to date. Received payment (name here) $34.50."

"According to my best recollection, I would not like to swear that I rendered her any services prior to the services which I included in this item of $34.50, covered by Exhibit 'J.' * * *
"*Q.* There is no doubt in your mind is there, doctor, that when these four bills were paid, that Mrs. More was perfectly competent to understand the amount of these bills, what she was doing in paying it, and about the transaction of that business with you?
"*A.* Yes, I think she knew. I said yes, I think she knew that she was paying the bills. I think she knew how much she was paying and to whom the money was paid and all that."

The doctor testified that he began to practice two years before he graduated. He produced his books in court but was unable to find any visit to Mrs. More charged earlier than March, 1893.

What Justice COOLEY said in *Fraser* v. *Jennison*, 42 Mich. 206, is especially pertinent here:

"It may probably be assumed that medical men judge of mental disease by somewhat different standards from those applied by the public generally. The public judge from the conduct which they observe, and which seems to indicate either sense or insane delusions; but the medical

expert discovers various indications of unsoundness which would escape others, and which may co-exist with careful, able and prudent management of private affairs. It is fortunate that experts have this greater ability and insight, for it enables them to prescribe for mental disease in its beginnings, and to advise the treatment of asylums before it becomes too late to arrest a growing disorder. But it would be in a high degree dangerous, as well as unjust, to deprive a man of the control of his property so soon as the indications of mental disease appear, notwithstanding he may still be managing it with propriety and judgment. For legal purposes, incapacity, either criminal or civil, must be judged of by manifestations in conduct and language. The circumstances and symptoms in which a physician alone can perceive a tendency towards mental disorder, may aid in understanding the manifestations subsequently appearing, but they can have little further value. The expert can never be put in the place of the jury, and be allowed to decide the case on his opinion of what was naturally to be looked for in the mental history of a person shown to have had peculiar surroundings and a peculiar experience.   *   *   *

"Under the law, no doubt, whoever may make a contract may make a will; but the manner in which will cases are treated would naturally lead to a different conclusion. If, in the case of contracts alleged to be void for want of mental capacity, the same delicate tests were applied, and the same range of inquiry permitted which have become customary in testamentary cases, no one could ever know when he would be safe in dealing with his fellows; for in business one must necessarily act upon appearances, and upon the common recognition of capacity by the community; and he cannot stop to investigate whether there was insanity in the family; or eccentricity in the conduct of the person with whom he contracts or barters, or whether there is bad behavior among his children. Commerce of all descriptions must languish if contracts were subjected to the sort of inquiries which seem to be thought proper in the case of wills. Yet in law this is as admissible in the one case as in the other, and as reasonable. But nothing can be more illogical than the notion that a perceptible taint of insanity, not evidenced by any delusion or disorder which the public can detect, and not apparently affecting the ability to manage business concerns, shall vitiate all civil acts, even though it is conceded that an

unquestionable partial insanity shall not have the like consequence, provided the delusion is upon some subject foreign to the act done.   For our part we are not ready to assent to any rule that shall make a derangement of the faculties operate to incapacitate a person from making a valid will, when it is neither of a character to render the person incapable of acting rationally in the ordinary affairs of life, nor has it manifested itself in the testamentary provisions.   *Meeker* v. *Meeker*, 75 Ill. 260–266.   Whatever court overturns a will ought to have reasons to stand upon which are within the grasp of the common sense of mankind."

It is said Mr. Kraft, her hired man, gave testimony tending to show her incompetency.   His testimony was in substance that she was sometimes forgetful.   That she sometimes put money under the edge of the carpet; that she put money under the sheets in her bed and was unable to find it until she had shaken out the sheets; that he found $5 in an envelope in a little plate over the rafters in the wood shed; that when she worked in the field with him she would once in a while, or twice a month, hoe up vegetables instead of the weeds; that she once emptied baskets that he had filled with vegetables.

"One time she had planned to make a flower bed.   I started to make the bed and after I had made it she commenced to tear it to pieces for me.   I asked her what she did that for, and she told me that she didn't want that bed like that.   I said, 'It is just the way you wanted it,' and after talking a little while she told me to go ahead. I had started it in accordance with her plans, as I never did anything unless we consulted together and had everything as she wanted it.

"*Q.* Do you remember any occasion when she attempted to leave the house?

"*A.* Yes; she had one of those peculiar attacks.   Something funny— * * *.   It was when Charles More was there.   She says she wasn't going to stay there tonight.   It was about 4 o'clock in the afternoon.   I asked her where she was going and she told me that she was going away.   I told her, 'I guess not.'   After a little while I talked with her and Mr. Charles More come home

with his wagon and it kind of took her mind off and she came back to the house."

On the cross-examination the witness stated:

"When I went to market I sold the goods when I was there and if I had to go off and deliver goods, she stayed there and sold until I came back. She sold some while I was there. I continued to go to the market with her until I left there, June, 1888. When I went to work for her she fixed the wages she was to pay me. Mrs. More was my boss when I was there. Mrs. More paid me for my work at the time I left there. I used to go down to the bank for Mrs. More. I never drew money out of the bank for her.  *  *  *

"She went to Hislop's office provided she went down to the bank. I took her with the horse and buggy. Mrs. More discussed her street opening case with me and told me she did not want the street opened. When I was with Mrs. More I used to drink quite heavily when I wanted to. I got drunk every day and worked every day, too. Generally more or less I would get drunk. I generally been full more or less every day. I think I was sober myself at all times more or less when I noticed the peculiarities I have mentioned about Mrs. Huldah More. Charles W. More was drunk a good deal when he was at his mother's and died of delirium tremens. I have been drunk when I was hoeing in the garden. Huldah More did all of the housework when Charles and I were there.

"Q. Then Mrs. More did not have a very pleasant life up there with you and Charles around, did she?

"A. Sometimes she did and sometimes she didn't. If Mrs. More owed anybody she paid it. She was a good business woman in some ways. When I left there she took a receipt from me. Mr. Clark wrote out the receipt and I signed it."

It appeared by other testimony that Mrs. More discharged the witness because of drunkenness after giving him fair warning and declined to take him back. The above is substantially all the testimony bearing upon the question of incompetency.

Other language of Justice COOLEY in *Fraser* v. *Jennison*, supra, is pertinent here:

"Now that it has become so common to assail, on alle-

gations of mental disease, the wills of those who in life, in all their business and family relations, were treated as sane, it becomes of high importance that evidence should not be received as suggesting insanity unless it has some legitimate tendency to prove it. We are persuaded that much wrong has unwittingly been done in many cases, by allowing misfortunes, family calamities and personal peculiarities to go to the jury as having some necessary tendency to unsettle the mind, and therefore some bearing on the issue of mental soundness. As disturbing causes may be discovered in the family or personal history of almost every living person, the general result is that occasion is found for contesting the validity of almost every will, especially if the estate is sufficient to tempt the endeavor. Was the decedent afflicted with a loathsome disease? Then this presumably affected his mental health. Were his ambitious hopes disappointed? Then his reason must have given way. Did a brother have fits? Then there must have been insanity in some ancestor which has tainted the brain of all descendants. Has the only son gone to ruin? Then he must have inherited mental weakness from his father, and his bad conduct has probably reacted upon the father and disturbed his reason. Did the deceased have ways differing from most men, and rendering him eccentric? Then surely, as most men are sane, he must have been insane. Has he failed to remember some nurse or some cousin in the distribution of his bounty? Then behold, in ingratitude and want of family affection, the plain indication of mental disorder. But we need not pursue the list. Give free admission to such evidence, and no man can feel assured that the jury which examines his will in the light of his family history and personal peculiarities, will not adjudge him a madman. * * *

" It is said the provisions of the will betray ingratitude and a want of natural affection; he did not remember the nurse who cared for him with a devotion so remarkable and disinterested, and he did not distribute his estate equally among his relatives. But how do these facts prove a want of testamentary capacity? He may have justly supposed that commissioners upon his estate would award to the nurse full compensation for her labors, and nothing is more unquestionable than that, by the statute of wills, it was intended that every man should be at liberty to select the objects of his bounty among his relatives at discretion, or even to pass them all by if so dis-

posed. When no will is made the statutes of descents and distributions regulate the division of decedent estates on the rule of equal claims, among next of kin; and if this were supposed to be the only just and proper distribution, the law would permit no other. But the right to give property by will is conferred for the very reason that the owner is supposed to be able to make, in his particular case, a better distribution of his estate than could be made by any general and unvarying rule; that he knows who by their needs, their affection, their care and solicitude for his welfare, their kind regard for himself and for those to whom he has been attached, and by the thousand other circumstances naturally operating upon the mind, should be remembered in his bounty, better than any others can possibly know, and much better than any general legislation can possibly provide. *Matter of Gleespin*, 26 N. J. Eq. 523. And even when provisions appear unnatural, it can seldom be known that there were not undisclosed reasons which would fully justify what was done if we knew them."

We now come to the other branch of the case, and that is, Should the case have been submitted to the jury upon the theory of undue influence? If any one exercised undue influence it must have been Mr. or Mrs. Clark. They lived upwards of 50 miles away from Mrs. More, and visited her once or twice a year at her home where it has already appeared she was successfully conducting her own affairs. We have already referred to the testimony that Mrs. Clark objected to Nellie Schmidt living with her grandmother, and the reasons she gave therefor, and that, notwithstanding what she said, Nellie went to live with her grandmother. Mrs. Ulrich testified that after the death of her father she went to her grandmother's with Mrs. Whittaker, when the following occurred:

"My grandmother was standing in the door. Mrs. Whittaker said, 'Mother, I brought Helen up here this morning; she said she came to attend her father's funeral.' That was the first and grandmother said, 'I don't want them here. Who sent for them?' I cannot recall what reply Mrs. Whittaker made to that, but Mr. Kraft spoke

up and said: 'Why, Mrs. More, let her come in; she is Charles' daughter and naturally she would want to hear something about her father's death,' and then she let me in the house.    When I went in I found Mr. Kraft, my grandmother and Mrs. Clark in the house and asked the question why we had not been sent for.    My grandmother replied, 'I consulted with Bill and Delia about it and they said you better not come for you would only make me trouble,' and she began to cry.    By Bill she meant William Clark, Adelia's husband.    Then I asked her what trouble I could make, and she did not seem to be very clear upon that subject.    I do not know that she made any reply to that question except that she said later in the conversation that my father had left everything he had in the world to her and if I would go back to New York and stay and not come here and make her any trouble she would do what was right by me, but if we made her any trouble I should be cut off without a cent.

"Mrs. Clark was present during the greater part of this talk.    She was getting ready to return to Vernon.    I cannot say she heard every particle of the conversation, but she was there in the first part of it.    She was there when I went into the house.    It is so long ago that I would not want to state positively that Mrs. Clark was present when my grandmother said that if I would return to New York and make her no trouble she would do what was right by me.    Mrs. Clark did not say anything on that occasion and Huldah More did not say anything further that time. Nothing further was said than I have stated.

"My father died December 1st, 1887.    I remained at Mrs. Whittaker's until after Christmas and then returned to New York.    I cannot recall that I ever went to my grandmother's again until I returned to Detroit to live in the fall of 1888.    From that time I lived constantly in Detroit until 1894.    I was married in 1893.    From 1894 to the 15th of November, 1901, I was away from Detroit.    I have lived constantly in Detroit since 1904.    My mother and sister came to Michigan in 1889 or 1890.    From the time I came to Detroit in 1888 until my mother and sister came in 1889 or 1890 I was at my grandmother's once every week on an average and sometimes oftener.    I never had her show me anything but the kindest spirit, except the day I came after my father was buried.    I was always welcome.    Sometimes, before my mother and sister came to Detroit, I would spend my Saturdays at my

grandmother's, sometimes my Sundays. After my sister came to Detroit we used to go together and spend the day with grandmother. About a year and a half before my father died and while we were living in New York, my sister came to Detroit and visited papa for three or four weeks. During the period that I have described, Mrs. Clark visited at my grandmother's sometimes two or three times a year. Sometimes during the winter she would visit there for a couple or three or four weeks, sometimes longer, sometimes not so long, and she always made it a point until, I think, a year or two before my grandmother's death, to try to be present at her birthday, on the 23d day of March, and, of course, we were always all there, so I saw her at those times. There was a difference in my grandmother's treatment of me on these occasions when Mrs. Clark was there, and her treatment on other occasions.

"When Mrs. Clark was there grandmother did not want me to stay so long. She wanted my visits to be as short as possible. She always acted under restraint. When Mrs. Clark was there she never seemed to be able to feel free to express herself as she wanted to, or do anything about her home as she would like.

"*Q.* What do you mean when you say 'do anything about her home?'

"*The Court:* Did she talk on these occasions that way when Mrs. Clark was present?

"*A.* She talked very little.

"*The Court:* On ordinary occasions, what was the conversation?

"*A.* She would want to see me and she would tell me everything that had happened from the time I had been there before.

"*The Court:* Is that what you meant by talking under restraint?

"*A.* Yes, sir.

"*The Court:* Was there anything different in her talk, if so, point out the details, the difference in her talk?

"*A.* None, except in her reticence, her comparative reticence.

"*Q.* Was there anything else you noticed except the fact that she did not talk as much?

"*The Court:* And beyond the fact that you were not urged to remain as on other occasions?

"*A.* No, sir. I do not think that I could say that there was."

Witness continues:

"From the fall of 1888 until almost the week that she died my gradmother and I used to talk over some of the belongings of my father and mother. Everything my mother had was in my grandmother's possession. Everything my father and mother had in their home was in my grandmother's possession. I talked with my grandmother about my obtaining some of that property in the fall of 1894, and before that time I had a general talk about this property but I did not talk with her before 1894 about my taking any of it.

"*Q.* What talk did you have in 1894 with your grandmother in regard to that? * * *

"*A.* She told me that there were certain articles in the house I might have, as long as I was going away. She said if I took them away somewhere Mrs. Clark would not know I had them. Mrs. Clark had repeatedly said she did not want us to have any of the things that belonged to my mother and father, and I took my mother's wedding presents, consisting of some silverware and two of my mother's rings and her gold bracelet, and she also gave me, and I think I took two comforters and a pair of pillows. That was before I left the city to reside, in 1894, and she knew that we were going away. She helped me to pack the box, but I could not have it until I had located in Forest, Ill., and then she sent it to me with the understanding that I was to remit her the price of the cartage and pay the freight, which I did. After I returned to Detroit I obtained some other property of father's and mother's. * * *

"We drove up there and it was pretty cold and had a light robe, and grandmother said to me 'I have a nice fur fox robe upstairs and there is a great deal of warmth in it. I would like to give it to you, but I cannot give you anything because Delia knows they are in the house and there will be trouble over it. But,' she said, 'I have a right to sell what I please. If you will give me a dollar you may have the robe, provided you can get it out of the house.' Mrs. Clark's daughter, Mrs. Payne, was in the house at that time. Grandmother did not say anything about Mrs. Payne then, she spoke about Mrs. Payne's mother. I paid the dollar and got the robe out of the back door. * * *

"On my return from Forest I had a talk with my grandmother in regard to my having disposed of some of my things, and before that talk occurred I had a talk with her about some of my father's and mother's property that was in the house. * * * I had made a statement that I had to dispose of a number of our household goods on account of the exorbitant freight rates we had to pay, and among other things I said I had disposed of my parlor and bedroom furniture, and grandmother said, 'There is some of your father's things upstairs, Helen, including a dresser and low rocker, that belonged to your father's parlor set. I suppose you might as well have them.' So I took them. She said my aunt did not want her to give me one thing that belonged to my father.

"*Q.* At any time after you returned to Michigan from New York, did your grandmother ever say anything to you about the disposal she had made of her property or that she proposed to make of her property? * * *

"*A.* Why she said she promised my father she would do what was right by us girls and when she got through with her property she should do as she promised William, and she said he told her that when she was through with her property—to use it all if it was necessary in caring for herself, but when she was through with it—to divide it equally among the children, and she had as far as lay in her power carried out all his wishes, and she fully intended to do so. By William, she meant her husband, my grandfather.

"My grandmother made a statement to me about Mrs. Clark's interference with her business affairs. The first was in the latter part of 1888, and she made statements to me in that regard afterwards. I could not give the date. These statements were made after my return from the west, and she made statements about Mrs. Clark to me before I went west, about her interference with her business matters. Conversations on this subject occurred from the time I returned in 1888 up to the week before she died. That is all I can say.

"*Q.* What did she say in reference to Mrs. Clark during the period elapsing prior to your going away from the city during 1888 up to 1894, other than those you have specifically detailed?

"*A.* She said she never transacted any business without Mrs. Clark's advising her in regard to the matter."

On the cross-examination of this witness, it was dis-

closed that she was given a check for $86, and signed a receipt reading as follows:

"December 9th, 1893.

"Received of Huldah More, administratrix of the estate of Charles W. More, deceased, $86.41 in full of claim due me from estate of Charles W. More, deceased, as his heir at law."

And her sister did the same thing at the same time. She also testified:

"Grandmother never told me but once that she wished I would go home when Mrs. Clark was there with her, and that was sometime about 1901. Mrs. Clark was at grandmother's at that time and had been there a week, but she was not present when grandmother told me she wished I would go home, she was not in the room. Grandmother was expecting Mr. Hislop at the time. She said she had sent for him. Mrs. Clark never indicated to me that she did not want me at my grandmother's. I had to pay Mrs. Clark's taxes as well as grandmother's."

We have quoted the testimony of this witness at great length because it is as favorable to the theory of contestants as any that was offered. It must be remembered that Huldah More is not here to give her version of what occurred, and that Mrs. Clark denies that she ever sought to influence her mother. But treating the testimony as true, what does it show? Conceding that Mr. and Mrs. Clark had advised Mrs. Huldah More against sending for the family of Charles W. More, when he died under the distressing circumstances shown by the record, it also shows that when his daughter did appear she was admitted to the house, and that her grandmother ever after that was friendly to her. It also shows that the oldest daughter, Mrs. Clark, visited her mother but one to three times each year, while the Detroit relatives visited her as often as they pleased. It also discloses that, when her oldest daughter came from 50 or 60 miles away to make her occasional visits, Huldah More desired to pay her more attention than she did the young granddaughter who lived in the same city, and whom she saw weekly.

Is this unnatural conduct? Conceding that Mrs. Clark was opposed to her mother letting Mrs. Ulrich have the property left by the father of Mrs. Ulrich, it is evident that her desire was not controlling, for Huldah More let Mrs. Ulrich have the property which she says her grandmother told her Mrs. Clark did not want her to have. Conceding that Mrs. More told her that she never did any business without advising with Mrs. Clark, is there anything wrong about that? There is nothing to show that the advice was improper. We have already referred to the fact that before the husband of Mrs. More died, he deeded to each of the children one acre of ground; at that time Mrs. More became the owner of a little over two acres of ground. It already appears that at the time of her death she was worth in the nighborhood of $25,000. This would not indicate that she had followed poor advice, and certainly there could be no impropriety in Mrs. Clark talking with her mother about her business affairs, when her mother so desired.

When the will was made, three of the children of Mrs. More were dead. The widow of Charles W. More and his children were living at Waterloo, New York.

Mrs. Whittaker was married to a business man and was sufficiently prosperous so that when Nellie Schmidt went to live with her grandmother, Mrs. Whittaker provided her with clothing and school books. Though the Whittakers lived in Detroit, Mrs. More did not attend the wedding of Carrie Whittaker which occurred in 1879, nor the wedding of Ida Whittaker which occurred in 1882, though she was invited to both of these weddings.

A reading of the will shows that she remembered both of her living children, and all of the children of her dead children, and made such provision for each of them as she deemed wise. This will was made nearly 15 years before her death, and was at all times under her control. If, under the circumstances disclosed by this record, this will can be set aside, then no person can make a will and feel any certainty it will be given effect, if there

are any disappointed relatives who care to contest it. The case is within *Reichert* v. *Reichert*, 144 Mich. 295; *Leffingwell* v. *Bettinghouse*, 151 Mich. 513; *In re Hoffmann's Estate*, 151 Mich. 595; *In re Dowell's Estate*, 152 Mich. 194. The court should have directed a verdict in favor of the proponents.

Error was assigned upon the opening statement of counsel, and to the running comments of another of the counsel during the taking of the testimony, of which the following is an example:

"Mrs. Charles W. More was testifying, on cross-examination, that she had presented before the commissioners on claims against the estate of Huldah More a claim for all the services she had rendered her. Mr. Van De Mark said: 'So did Mrs. Clark, and Mrs. Clark's was allowed, and Mrs. More's was not.'"

We shall content ourselves with saying that some portions of the opening statement are not to be commended, while the remarks of counsel above referred to are condemned. If counsel possesses any information in relation to the facts which he thinks should get to the jury, he should be sworn as a witness and subject himself to the rules governing the taking of testimony.

Judgment is reversed and a new trial ordered.

MONTGOMERY, OSTRANDER, HOOKER, and CARPENTER, JJ., concurred.