CLARK *v.* GUSTIN.

1. DEEDS—COMPETENCY—EVIDENCE—CONSIDERATION.
   *Held,* that complainant's contention that she was induced to execute a deed of 120 acres of land by fraud and undue influence was not sustained by the proofs; and that the deed was not void for incompetency.

2. SAME—CANCELLATION OF INSTRUMENTS.
   Evidence considered, and *held,* to show performance by defendant of his agreement for the grantor's support and maintenance during her lifetime, made in consideration of the deed.

Appeal from Shiawassee; Miner, J. Submitted April 29, 1913. (Docket No. 121.) Decided September 30, 1913.

Bill by Adelia Clark against Daniel T. Gustin for cancellation of a deed. From a decree for defendant, complainant appeals. Affirmed.

*Thomas Hislop*, for complainant.

*Byron P. Hicks*, for defendant.

MOORE, J. On January 8, 1909, the complainant made a warranty deed to defendant of 120 acres of land. The consideration stated therein is "for and in consideration of the execution of a certain contract bearing even date herewith." The deed contains the following:

"Saving and reserving unto said party of the first part the use of said premises for and during the term of her natural life. Provided always that if said second party shall fail to perform on his part a certain contract made and executed between first party and second party bearing even date herewith, then the estate above conveyed to second party shall cease and said first party shall have the right to re-enter and dispossess said second party and the estate hereby conveyed shall be forfeited, but in case no forfeiture shall be declared by first party during her lifetime the estate herein granted shall become absolute upon the death of first party."

The contract referred to in the deed, omitting the formal parts thereof, reads as follows:

"Witnesseth, that whereas, the said party of the first part has this day deeded to said party of the second part, a certain piece or parcel of land situated in the township of Vernon, county and State aforesaid, known and described as follows, to wit:   *   *   *

"And whereas, said first party has reserved in said deed a life estate in and to said lands and has provided for a re-entry and termination of the said estate of said second party, in and to said lands any time during the lifetime of first party, when said second party shall make default in the conditions thereof which condition is the performance of this contract; and providing also that in case said first party shall

not re-enter or divert or terminate the estate of said second party under said deed during her lifetime, that it shall become absolute at the death of first party.

"Now, therefore it is hereby agreed by and between said parties that in consideration of the execution and delivery of said deed by said first party as aforesaid that said second party agrees to move onto the said premises above described and live thereon with said first party and make a home there for said first party and to furnish said first party with board and care in sickness and in health at any and all times, when she shall choose to be and remain at the home of the party of the second part. Said first party to furnish her own clothes, pay for her own medicine and doctor bills and if during sickness it shall be deemed by the attending physician necessary to have a professional or trained nurse the same shall be procured at the expense of first party who shall be boarded free of charge by second party. Said second party agrees to provide and furnish first party with a tenant for said farm who will work the same as long as first party shall live on the terms one-third to first party and two-thirds to the tenant; said tenant to reside in tenant house on said farm. Said first party agrees that all profits derived from said farm under said arrangement with said tenant shall be expended in improvements on said farm.

"First party shall have the right to insist that second party live in the house on the farm above described, but if the parties hereto mutually agree, they may move into the village of Durand during certain seasons of the year without voiding or affecting any of the other provisions of this contract and the obligation of second party as above provided shall continue the same in such home as though he lived on the farm, but said second party shall not have the right to move off said farm without the consent of first party."

July 29, 1911, this bill of complaint was filed. The prayer is:

"(1) That the said deed be set aside and declared to be void and a fraud upon your oratrix, your oratrix being willing to pay and now here tendering to the

said Gustin any sum found by said court to be due to said Gustin from your oratrix in the premises, the equities in the premises being considered, and that said contract be declared to have been fraudulently obtained and violated, and that said defendant holds said deed without consideration.

"(2) That your oratrix be restored to her rights in said lands, and that a full accounting be had between the parties hereto, and, if the said Gustin has conveyed or incumbered said farm, that your oratrix may make the parties claiming any interest by reason thereof parties to this suit.

"(3) That your oratrix may have such other and different relief in the premises as may be agreeable to equity and good conscience, and your oratrix will ever pray."

Mrs. Gustin was not made a party to the proceeding.

The case was put at issue and tried in open court. The record contains upwards of 350 printed pages. The trial judge filed a long written opinion, in which he reviewed the contention of the parties. In the decree occurs the following language:

"And the court, being fully advised in the premises, finds that the complainant has failed to prove the allegations of the bill of complaint as to fraud, undue influence, or lack of mental capacity on the part of the complainant to enter into the contract with defendant, that there is not a particle of evidence in the case to show that Dr. Fair or Mr. Hicks had any interest in the case whatever, or that they were in any way governed except by the highest and purest motives.

"Neither does it appear that the defendant has been guilty of any violation of his contract which would warrant this court in setting aside the deed; but the court does find that it was intended by the parties that the property described in the bill of complaint * * * was intended by the parties to be the means of giving complainant her board and good care.

"It is also evident that the litigation between the parties has intensified any feeling that might have

existed between the parties, so it is doubtful, if the undertaking contemplated by the parties can now be so executed that the complainant would be contented and comfortable in the old home with defendant.

"It is therefore ordered, adjudged, and decreed that the prayer of the bill asking that the deed be canceled should be denied, but that the defendant be required to pay to complainant the sum of $6 per week, commencing from the 1st day of September, 1911, and to continue during such time as she may desire to remain away from the home of the defendant, which sum shall be a lien on the land above described, but that complainant shall have the right at any time she sees fit to return to the home of defendant and live with him in accordance with the terms of the contract. Neither party in this case will recover costs as against the other."

The complainant has brought the case here by appeal. The defendant did not appeal.

Counsel evidently regard the questions involved as those of fact and not as questions of law, for the counsel for appellant quotes no legal authority in his printed brief, and in a written memorandum cites only *Shepardson* v. *Stevens,* 77 Mich. 256 (43 N. W. 918), while counsel for appellee contents himself with citing *Wilson* v. *Wilson,* 160 Mich. 555 (125 N. W. 385).

Mrs. Clark has been in this court before. See *Clark* v. *Ulrich,* 153 Mich. 695 (117 N. W. 329). In that case it appeared that her mother, Huldah More, died at the age of 93 years. When Mrs. Clark went to live with the defendant and his wife, she was 77 years of age. Besides the farm in controversy here, she had another farm of 60 acres, several thousand dollars in the bank, real estate in Detroit, for some of which, whether all or not we do not know, she sold to the school board, since the deed in controversy here was made, for $27,000. She had but one child, a married daughter, whose husband, the evidence tends to show, was in the habit of getting intoxicated.

The circumstances under which the deed and contract were given are disclosed by one of the witnesses, the material part of whose testimony is as follows:

"Dr. Robert C. Fair, sworn for defendant, testified:

"I have practiced medicine and surgery in Durand for 21 years, having graduated from University of Michigan. I am district surgeon of the Grand Trunk Railway Company and president of Shiawassee County Bank from 12 to 15 years, having succeeded William H. Clark, complainant's husband. Mrs. Clark has been a stockholder all this time. I first became acquainted with her at the time we operated on her daughter, I think, in 1905. My wife and I own a clothing store jointly, and do business as Fair, Gustin & Co. Mr. Gustin has not a dollar invested in it; he works for the firm at so much per week; that is all his relation to the firm. After becoming acquainted with Mrs. Clark, I attended her at different times. * * * I remember being called out to see her in September, 1908, by her daughter. Used to see her once in two or three weeks, and think that time had elapsed from last visit until this time. I had seen her on the 16th of September, five days before. She was suffering considerably from heat and asthma and quite fatigued. Mr. Gustin accompanied me from Durand that day in an auto. I had asked him if he wanted to go out and put up some signs. * * * I left him at the corner at the schoolhouse. Paine lived about 40, 50, or 60 rods from there. * * * I found Mrs. Clark in her room over the dining room, where I had seen her before. It was quite a large room, with the edges of the room cut off, you know, story and half house. Think there were three windows in the room. She complained the room was so hot that she was suffocating, said: 'Doc. Fair, you have got to take me away from here today. I have got to get out of here, or I will die.' I tried to pacify her and tell her to try and quiet down and we would talk the matter over, that we could perhaps arrange for another room downstairs, where it would be cooler. She said, 'No,' that she had tried to get that for a long while back, and Fred and Mate wouldn't give up their room, and they wouldn't let her have

the large room downstairs. She said she had been trying to get another room; but they wouldn't give her anything, that she had to get out, or she would die that day, and that I had to take her out. I either was to take her to Durand, or take her to Vernon to Howd's, to her farm. * * * I asked her to be quiet, and gave her a powder, and went down to talk with Mr. and Mrs. Paine. * * * I told them what she said, and that she insisted on being taken away, that she either wanted me to take her to Howd's or down to Durand some place. I asked them what the trouble was. Fred said, 'She is having another one of her sprees,' and I don't remember as Mrs. Paine said anything to that; but they both said, 'For God's sake, don't take her to Howd's, for Howd is a scoundrel, and he will beat her out of every cent she has got.' * * * The thought occurred to me of Gustin's people keeping roomers, and he was on the corner. I said, 'Mr. Paine, go down and see Dan,' and he went, and Dan came up with him. * * * When he came, I talked the matter over in his presence. I explained to Dan that Mrs. Clark wanted to go away from there and wanted to go to Durand if she could go, and that I knew of no place to take her on such short notice, and asked if they would consent to take her for a time. He said he couldn't say anything about it one way or the other. 'I could call up my wife,' and if she wanted to it wouldn't make any difference to him; but it would be just as she said. * * * Then I called up Mrs. Gustin. She said she couldn't take her.

"*Q.* Go on and give the conversation you had with Mrs. Gustin.

"*A.* I explained to Mrs. Gustin that Mrs. Clark, who lived at Mrs. Paine's, wanted to come to Durand, get a room, and stay there for a time, and I asked her if she would consent to take her, and Dan was present there while I was talking, and he said it would be just as she said about it. 'Why,' she said, 'Doctor, it would be impossible for me to take her at the present time; my rooms are full, and I have no place to put her.' 'Well,' I said, 'she says she has got to go today, and she has got to go some place; if you can take her for a few days, it would be an accommodation to me to get her some place.' Mrs. Gustin said, 'With that

understanding, I will take her for a time.' *  *  *
Mrs. Clark had her stuff all packed up, and I went up
and told her, and helped her carry it downstairs.
Mrs. Paine or anybody else did not go upstairs with
me. I assisted her downstairs with her luggage.
*  *  *  She went away in a half or three-quarters
of an hour after she came downstairs, perhaps an
hour. When she left, she was angry and nervous;
she was very angry.

"Q. Did she remonstrate?

"A. Why, she did to me; yes, she told me about
how she had been used. She said they had used her
like a dog there; they wouldn't give her anything;
they wouldn't give her any room that was fit to sleep
in, and the room she was in was terrible hot on this
particular day. *  *  *  After she got downstairs
and got straightened around—by the way, she had
spoken to me upstairs about this $900 note which was
going to outlaw in just a little while, and she was so
angry, she was crying about it at the time; she was
going to sue Fred Paine. I said: 'Mrs. Clark, just
be quiet and don't let that worry you at all. I will
speak to Mr. Paine for you, and I know Mr. Paine
will fix it up satisfactorily. There won't be any
trouble about it; you won't have to sue him; there
won't have to anybody sue him; I will talk to him.'
And I did speak to him when I went downstairs; they
said they would fix it. I told him if Mrs. Clark owed
him for anything, board or anything, to take it out,
but get that matter adjusted so she wouldn't be
worried about it. After she came downstairs she
spoke about it again in their presence. I interrupted
and told her I had spoken to them, and the matter
would be fixed up; leave it alone, and it would be ad-
justed before it outlawed; and it was afterwards ad-
justed, after she was to Gustin's. *  *  *  Nothing
was said to Mrs. Gustin about any terms, nothing
said as to what she would receive, when I spoke over
the 'phone. Mrs. Clark told me why she was leaving
when she was up there before she left; because she
couldn't get a suitable room, and she didn't like Fred
Paine, she said, because he was unreliable and dis-
honest and was always drinking and wouldn't work
her farm for her satisfactorily, wouldn't settle up
with her, and all that sort of stuff. She said she had

offered to give Charlie the farm, and that at one time
he talked as though he would do it, and she bought
him a team and started to carry out her part of the
agreement, and when she asked him about getting
some one to go on the farm with her he told her he
wouldn't take her old farm as a gift.  She told me
she had made a bargain with Niver to move down on
the farm; he was to live there and work the farm,
and she was to give him the farm; she was going to
live with him.  She told me that before she canceled
it.  *  *  *  Before September, while I was treat-
ing her, she told me she had been trying to get some-
body to move onto the farm and take care of her.  I
tried to get some one for her, but did not succeed.
When she left Paine's, I saw Mr. and Mrs. Paine
when they parted.

"*Q.* Describe the parting between her and Mrs.
Paine.

"*A.* When they parted, they simply parted; she did
not kiss her mother goodbye.  I carried her satchels.
She said nothing to Mr. Paine.  He said nothing to
her.  He and I had some conversation.  I said I was
sorry to see her going away in that mood;  *  *  *
that I had done all I could to get her to stay, and Fred
said that he didn't care anything about it, he was
glad to see the old bitch go.  *  *  *  He said she
had nagged her husband to death, and had never been
able to get along with anybody.  After she got to
Durand, I saw her the next day.  *  *  *  I saw
her pretty nearly every day from that time on.  In
about three weeks she was taken severely sick.  *  *
*  I got a nurse for her, who was nursing in Du-
rand.  I don't think she was there a week.  Before
the nurse came and afterwards, Mrs. Gustin took
care of her.  She was given the large bedroom on the
first floor.  Her severe illness lasted about a week.  I
did not see Mrs. Paine; she never came to see her
at Gustin's during the first year she was there.  She
spoke to me about Mrs. Paine not coming there; said
it made her feel sad to think that her daughter—
that she had been there about a year, and her daugh-
ter had never come to see her.  After she got over her
illness, she spoke to me about a proposition to Gus-
tin's people in regard to the farm.  I don't think that
was over a week before the deal.  She said that she

was thinking of deeding her farm to Gustin in consideration of their taking care of her the rest of her life, and asked me what I thought about it. She did not at that time tell me of having made other offers; she did at other times; said she had offered it to Mr. Conn. When she spoke of the Gustin deal, she asked me what I thought of it. I said: 'Mrs. Clark, I have helped to get you out of one deal of that kind, and I don't want you to get into another. Take my advice, and don't deed your farm to anybody; you have plenty of money to pay your way. If you like it as well as you say with these people, pay them well; if you get dissatisfied and want to go away, you can go away, then you can come back again, but don't deed your farm away.' She said that was very true, but she might go through the rest of her property or might lose it, and if she made such a deal she would know she would always be protected. I said to her: 'I can only say one thing in regard to it: I advise you not to do it; but I will say, whatever Mr. Gustin agrees to do with you he will undoubtedly do to the letter, because I would trust him with every dollar I have on earth. Mr. Gustin has been in my employ six or seven years; I have known him since he was a boy.' Finally, one day Mrs. Clark told me she had decided she was going to deed her farm to the Gustins on that sort of a basis, and she also wanted to make a will at the same time, and she said: 'Now I want to make a will—make a deed that can't be broken down, because I know that Paine's people will contest it when I am dead, and William Clark would raise right out of his grave if Fred Paine was to ever get a dollar of his money. For that reason, I want to make papers that won't be broken, and I want to know what I have got to do.' * * * She asked me who I would recommend as an attorney, and I told her I would recommend Mr. Hicks, who was attorney for our bank, doing our business, and being honorable and reliable, and asked me to have you call and see her. I was present at the time she gave you instructions in regard to how she wanted her will, and told you to prepare the deed and contract and the will. I was not present when any of them was done, and did not see them previous to their being executed. Her health was fair for her at that time; her mind

was clear. I think her condition was better then than she is now. From that time on she would have sick spells. Some of them more severe than others. I think this last winter, in January, was the first time I called when she was sick and found her daughter there. She frequently spoke of the kind of treatment she got there at Gustin's.

"*Q.* What did she say about it?

"*A.* She said she never knew what it was to have a good home before; that these people had done everything in the world for her, and were doing, and it was no wonder that Mr. Gustin couldn't get ahead in the world, the way he bought stuff. She never made any complaint of not getting what she wanted to eat. Paine's people began to visit her more frequently, beginning the latter part of last January. My recollection is it was after that that I heard of the school board in Detroit making overtures to buy this piece of real estate. I was attending her in January, 1911, and before Mrs. Platt came there she had quite a severe attack of the grippe, and had recovered from that, so that her temperature was normal, and was getting along nicely. After getting along nice for a few days, she was suddenly taken with pain, and became rapidly worse. That was after Mrs. Platt had come there, she was taken so bad. Sunday, towards evening, Mrs. Paine asked me if I didn't think that mother had ought to have a nurse, and I said: 'Why, I kind of thought so last week, because she was very sick; but she is lots better now, and her temperature is normal. If she wants one, of course, it is entirely satisfactory to me. She thought she didn't want one when she was sick the week before.'   *   *   *

"*Q.* Was Mrs. Clark at that time sick enough to require, in your opinion as her physician, a professional trained nurse?

"*A.* She wasn't as sick at that time as she was the week before. After she was taken worse, she needed the best care she could get. She was a very sick woman. I couldn't state the date, but a short time after Mrs. Platt came she was taken worse, I think. Mrs. Clark said she thought it was something she had eaten that had made her worse, some green stuff of some kind, I think she said it was. Her lungs were bad, especially her left lung. She has had a chronic

bronchitis ever since I have had her in charge, a very bad one, and she frequently had acute attacks on top of that chronic condition, associated with asthmatic trouble. I had an examination made, and decided it was not tubercular, and so informed Mrs. Clark. * * *

"I was not interested in any way in the sale of this property, only to assist Mrs. Clark in what way I could, as she asked me for assistance. The first time that I heard about her going out to the farm she telephoned down from Paine's, I think, to Dan. He was out when I answered the 'phone; I happened to be in the store. She said she wanted to talk to Dan, and wondered if he was about ready to go out on the farm; that was the first time they went to the farm —the second year that she was at Gustin's I think it was, along towards fall. I called Dan and heard him talk. He said that he had just got ready to go on his vacation—I always gave him a vacation, and have him draw his wages—and that he and his wife had decided to go to Toledo the next day; but he said, 'Grandma, if you want to go to the farm, we will put off the Toledo trip and stay.' I couldn't say how long after that it was before he moved out to the farm. * * * I heard a conversation between Mrs. Clark and Dan in regard to going to the farm during her sickness in the spring of 1911, in the bedroom, along the latter part of March, I think. She said to me that when she got well, as soon as she was able, she wanted to arrange to go out to the farm this spring and stay there all summer.

"Q. Was Dan present at that time?

"A. She said, further, she wondered if Dan would be ready to go, and I asked her if she had said anything to him about it; she said she hadn't. I said, 'Let's call him in and have an understanding, so when you get ready to go there won't be any question about it.' And I called him in, and stated to him that 'Mrs. Clark wanted to go on the farm as soon as her health would permit, and she wants to know if you will be ready to go.' And he said, 'Certainly, grandma, I am ready to go any time, if you will give me a few days' notice so we can pack up; you give me 10 or 12 days' notice, and I can get out there any time, maybe on

shorter notice.' He said, 'I would be glad to go any time.'

"*Q.* At that time what was her condition as to being sick or well?

"*A.* She was confined to the bed until she went away; she got up out of bed when she went away. I saw her that day she went away. I had a talk with her about how it happened that she didn't stay at the farm when they were out there, and she told me she didn't intend to stay any longer than when it began to be cold weather, she wanted to go back to her fire, to furnace heat, and be handy where if I was called in the night, had a bad attack, she could get me."

The testimony of the complainant as to the essential things does not differ materially from that of Dr. Fair. Soon after the last talk with the doctor, the complainant, without giving any considerable notice to the defendant, went to the farm with the nurse. This was after dinner on the 9th of May, 1911. Mr. and Mrs. Gustin at once packed their household furniture and went to the farm on the morning of the 11th of the same month, completing the moving on the 13th. Without any trouble having arisen after complainant went to the farm, the complainant left the farm July 27, 1911, saying to the defendant and his family that she was coming back, but instead of going back she commenced this litigation two days later.

It will be noticed upon a reading of the deed and contract that by their terms Mrs. Clark was parting with nothing in her lifetime; Mr. and Mrs. Gustin were receiving nothing in the way of an income from the farm or from Mrs. Clark.

It would profit no one to go into the details of the testimony. A careful reading of the record convinces us that Mrs. Clark first proposed this contract, without it being suggested to her by Mr. and Mrs. Gustin, or any one else, and after she had proposed like contracts to other people. She was entirely competent to make it. The terms of the contract are such that

it cannot be said that it was an unconscionable contract.

The record convinces us that for nearly three years Mr. and Mrs. Gustin, with as little friction as could be expected, in good faith carried out their part of the agreement and have always been ready, and are still ready, to carry it out.

Upon this record no court would be justified in setting aside this deed. The defendant has not appealed, so that the part of the decree in relation to the weekly payments is not open for review.

The decree is affirmed, with costs.

STEERE, C. J., and McALVAY, BROOKE, KUHN, STONE, OSTRANDER, and BIRD, JJ., concurred.