## *In re* SHEPARD'S ESTATE.

### APPEAL OF SHEPARD.

1. WILLS—COMPETENCY—TRANSFERS OF PROPERTY.
   Acts of a testator in transferring property not his own may be considered in connection with other facts tending to impeach his mental competency, to determine whether he was competent to make the will.

2. SAME—UNDUE INFLUENCE—EVIDENCE.
   And they are relevant, when supported by other evidence, upon the question of undue influence.

3. SAME.
   Where the evidence conclusively demonstrates the testator's competency and the showing is as consistent with a lawful as with an unlawful disposition of property claimed to belong to another, it is not sufficient to warrant the court in submitting to the jury the question of mental incompetency.

4. SAME—INSANITY.
   It is *held* that the evidence as to insane delusion does not warrant the submission of that question to the jury.

5. SAME—UNDUE INFLUENCE—EVIDENCE—BURDEN OF PROOF.
   The burden of proof rests upon those contesting the validity of a will to establish undue influence.

6. SAME—MENTAL CAPACITY.
    The mental condition of the testator is an important factor in
      the determination of the question.

7. SAME—DEGREE OF PROOF.
    While direct and positive proof of undue influence is not re-
      quired, and the question must usually be determined upon
      circumstantial evidence, it should be sufficient to reasonably
      justify the inference that the mind of the testator had been
      dominated and overcome by the mind of another or had been
      deceived or misled by fraud and craft.

8. SAME.
    In a case which establishes the testator's sanity and compe-
      tency, the evidence of undue influence and fraud should be
      convincing in a high degree.

9. SAME.
    Evidence considered and *held* not to warrant the submission
      of the question of undue influence and fraud to the jury.

Error to Calhoun; North, J. Submitted January 12,
1910. (Docket No. 38.) Decided June 6, 1910.

Freedom G. Shepard presented for probate the last will
and testament of David Shepard, deceased. The will
was allowed in the probate court, and Alfred Shepard,
contestant, appealed to the circuit court. A judgment
for contestant is reviewed by proponent on writ of error.
Reversed.

*George W. Mechem, Dallas Boudeman,* and *Bernard.
J. Onen,* for appellant.

*Arthur B. Williams* and *Harrison Geer,* for ap-
pellee.

BLAIR, J. David Shepard died March 16, 1904, at his
residence in Battle Creek, at the age of 83 years and 5
months, leaving a will. His estate was inventoried by
the special administrator at $33,500. Two sons, Freedom
G. Shepard, the proponent of the will, and Alfred Shep-
ard, the contestant, survived him. His wife died in 1898.
In the course of his business career as a manufacturer of

threshing machines and by judicious investments he accumulated a property of over half a million dollars in value. The bulk of this property he had from time to time turned over to his two sons, so that on August 2, 1902, he had in his possession and under his control, according to contestant's brief, $78,552 of notes, bonds, stocks, mortgages, etc., of which contestant claims one-half belonged to him by previous gift from his father. On July 29, 1902, testator deeded to proponent his homestead, valued at about $15,000. On or about August 2, 1902, he transferred to proponent the above-mentioned personal property and executed the following writing:

"Whereas I have heretofore deeded my house and premises where I now reside to my son Freedom G. Shepard, and whereas I have this day made certain transfers of stocks and property to said Freedom G. Shepard, this is to certify that the same is done by me without any suggestion from said Freedom G. Shepard, and that he had no knowledge or intimation of the making of said deed until after same was made and executed, and no knowledge of the assignment or transfer of said stock and notes till this day when he was informed by me of my intentions so to assign the same, and to deliver the same to him. I further state that he has never at any time requested me to make any of the said transfers and has never sought to influence me in regard to the same, but all the same are made by me on my own motion and being the final disposition I desire to make of the said property.
"David Shepard."

On August 13, 1902, he executed the will in question, giving to proponent the residue of his estate after the payment of his debts, and appointing him executor. The third paragraph is as follows:

"I make no bequest in this, my last will, to my son Alfred Shepard, for the reason that I have heretofore given and delivered to him the portion and part of my estate that I desire him to have, and all of which he has before this time carried away with him. I make this suggestion for the reason that I have heretofore made some assignments of stock, notes and other choses in action to him with the then intention of at some future

time completing the transfer by delivering the same to him, but which were never delivered to him, and which assignments I have revoked and annulled before delivery and before completing the transfer. And I further state that all stocks, notes and other property which I have ever delivered, either directly or indirectly, to my said son, Alfred Shepard, have been taken possession of and carried away by him before this time."

Contestant filed objections to the probate of the will upon the grounds that the testator was mentally incompetent to make it; that it was the result of an insane delusion; and that proponent procured its execution by fraud and undue influence. From the order admitting the will to probate contestant appealed to the circuit court, where the will was disallowed, the jury finding, in response to special questions, that the testator was incompetent to make it, and that it was obtained by undue influence. Proponent has appealed to this court, urging, among other points, that there was no evidence to support the special or general verdict.

Mental Incompetency. Mr. Fred M. Wadleigh, a lawyer of standing and good repute, who drew the will, testified that Mr. Shepard was mentally competent to execute it, and that the statements contained in the third paragraph were the substance of the testator's instructions to him. The wholly disinterested friends and neighbors of testator, his business associates and fellow directors, and officials of important corporate institutions, testified to facts and opinions based thereon which, if believed (and they were undisputed), conclusively demonstrated his mental competency to execute the will in question. As an illustration of the character of this class of testimony, we refer briefly to the testimony of Mr. E. C. Nichols, president of Nichols & Shepard Company, who had from boyhood known David Shepard, and been for many years connected with him in business. He lived near him on the same street and had frequent talks with him. He had an interview with him a short time before going to Europe on May 22, 1902, and another after his return,

August 28, 1902, very soon after the execution of the will. A portion of his testimony is as follows:

"He was vice president of the new company, and acting president, being vice president, the president having died prior to that, of the old company. I called upon Mr. Shepard to talk about my going away and to learn from him if there was any reason or cause why I should not go. We felt, among other reasons, that it was leaving the Nichols & Shepard Company and the old company without any official head except Mr. Shepard himself, and our conversation turned upon the propriety of my going away, and the general interests of the business; about the conversation you would naturally expect among two men who were partners for a good many years, and one thinking of going off upon a long three or four months' European trip. At that time I discussed with him the business of the company quite fully. I should say the interview continued an hour and a half or two hours. * * *

"After my return on the 28th of August that year I saw David Shepard very soon. In the course of not more than a week I made a special visit to Uncle David's house and had a long and pleasant little visit with him, talking over the business of the year and the general conversation— about the ordinary conversation that would occur between two men situated as we were. I remember particularly how we felt about the fire, which occurred about a week or ten days after I left here. I talked with him about the fire and the excitement we would naturally have over the burning of a large building in the middle of an important season. He spoke especially of how well the force at the works organized themselves and managed it, resurrecting a lot of old burned machinery, got it going, and built a roof over it. He seemed very much pleased over the action of the workingmen who had made so much out of the situation in spite of its embarrassments. He seemed to indicate an acquaintance with what had been done, entirely so. We had two or three strange calamities while I was away, and they were referred to by both of us; one was the striking of the smokestack of our building there by lightning. This was while I was away. Another was that my house was struck by lightning during the same fall. He appeared to be cognizant of those facts. I remember we both felt that it seemed to be a sort of calamity upon us. * * *

"At no time on these occasions early in 1902 when I

saw him did I discover in David Shepard any evidence of unsoundness of mind. I did not discover anything in his conversation that was not connected, rational, and intelligent. When I returned from Europe from that time on until the time of his last sickness, I never discovered in David Shepard, in any of my interviews with him, any evidence of unsoundness of mind. * * * I think at either of these times, either in May, 1902, before I went away, or after I returned in August, David Shepard had sufficient mind and memory to understand his relations to Alfred and Freedom Shepard. I have no doubt whatever but that he had sufficient mind and memory to understand the nature and location and the general situation of his property. I have seen a copy of the will that is offered for probate here, and know something about the extent of that instrument and the matter it contains. I have no doubt that at those times before I went to Europe, and after I returned from Europe, in 1902, David Shepard had sufficient will power to plan out such a will as that which is offered here for probate, and to carry that plan into execution."

As late as January 14, 1904; and as he had frequently done theretofore, David Shepard signed a note as accommodation indorser for Nichols & Shepard Company, and nearly up to the time of his last sickness was looking after the bills and paying the household expenses with cash or by checks. He was transacting his ordinary business in the usual way, writing letters or dictating them, reading the daily papers, magazines, and books, making collections, making entries in his books, conversing in a rational way, and the people who dealt and conversed with him had no suspicion of his mental competency.

Miss Allie Mae Simons, one of contestant's most partisan witnesses upon the subject of mental incompetency, testifies that as late as October 3, 1903, she was writing business letters for Mr. Shepard "as he dictated," which were utterly inconsistent with a want of mental capacity. On January 25, 1902, he took an active part in a meeting of the board of directors of the Nichols & Shepard Company and was elected vice president of the company.

The dealings of contestant with his father; the letters

he wrote to him; the fact that, although claiming that his father was merely his agent in handling the property in dispute, he permitted him to handle it to the day of his death—are conclusive of his opinion that his father was mentally competent. Nowhere does he express the opinion that his father was mentally incompetent to make the will, and his testimony as to his acts and his conduct towards his father makes it certain that he entertained no such opinion. The chief witness for contestant upon this subject, and the one best qualified to speak from personal observation of the testator, was Mrs. Frances Simons, who was a subscribing witness to the will. Singularly enough, the precise question was not asked, and she expressed no opinion as to the mental competency of Mr. Shepard to make the will in question. Mrs. Simons was a niece of David Shepard, and made her home with him from April, 1892, until his death. The principal testimony that she gave as to his mental condition related to his conduct when playing cards. She testified:

"During the years 1899 and 1900 and 1901, Mr. Shepard spent his time in reading and playing cards. I played with him most of the time. We played 'cribbage' and 'cinch.' * * * From the first playing cards, he commenced to twit me of cheating in playing and he would many times when he would sit down to play, if I would sit down to play 'cribbage' (I would always ask what he wanted to play) and if I dealt in 'cribbage' perhaps he would commence playing 'cinch,' and I would say 'Why, uncle, we are not playing right, and perhaps I would play two or three games with him before I could make him understand that we were not playing the game that I had the cards dealt to play. That continued until his death. I continued to play these games with him after the spring of 1902, when he had the difficulty that I have described. In 1902 and 1903, my daughter also played cards with him in the house.

"Q. And when you played with him in 1902, I wish you would describe to the jury what, if anything, he would do in accusing you of cheating.

"A. He always would do that. * * * For the past two or three years he gradually grew worse. It got so

the past year that there wasn't hardly an evening we sat down to play cards with him that he would not shuffle the cards over after me from three to five times and maybe more. * * * He would occasionally play 'solitaire' before my aunt died, or I think it was 'desperation' he played some. He played that nearly up to the time of his death until he was taken sick the last time.

"*Q.* Do you know where he learned to play that?

"*A.* One game my daughter learned him. I think that was either in 1900 or 1901.

"*Q.* You mean the game of 'solitaire?'

"*A.* Yes, sir. * * * The first time that he said, 'Well now, you are cheating,' or something of that kind, was about three or four years before he died. During the first year that he said it, I think he said it more than two or three times.

"*Q.* And did he say anything to you about how he thought you were cheating, looking at the under card or something like that?

"*A.* No, I cannot recall his having twitted me of looking at the under card, but he would say, 'You haven't shuffled those right,' 'You can't do that again,' or 'I am going to do that.' He wasn't always good natured about it. That is the only thing he ever got angry with me about. * * * He never denied me the right to shuffle if it was my turn to shuffle. Never refused me a deal when it was my turn to deal. All he wanted to do was to shuffle them after me. In shuffling the cards I did the best I could. He generally shuffled the cards in the old-fashioned way. I think in 1902 this matter that I have spoken about in shuffling the cards right came up as often as once a week. We played every day, and I presume more than that.

"*Q.* And when he said, 'Now, you haven't shuffled those right,' was that sometimes before you dealt at all?

"*A.* Yes, sir; usually before I dealt.

"*Q.* And that was about what he said, wasn't it, 'You haven't shuffled them right, let me shuffle them?'

"*A.* Yes, sir. Then I would let him shuffle and I would deal.

"*Q.* Then he would play the game?

"*A.* Yes, sir."

She further testified that he gave her checks for her pay and that—

" He generally looked at bills himself. I never looked over the bills. He attended to them and paid them. That writing across the bill, ' Paid by check September 2, 1903,' is David Shepard's handwriting."

The only witness for contestant who was asked whether Mr. Shepard was mentally competent to comprehend the extent of his property and the natural objects of his bounty was one Ransom Lloyd, who expressed the opinion that he was not. On cross-examination he testified:

"*Q*. What do you mean by the 'object of his bounty ?'

"*A*. Why, I mean that he might have been under obligations and still not recompense them for what they had done, or something like that.

"*Q*. That is it, in other words, you don't think that he would know whether he was under obligations or not to somebody ?

"*A*. Why, it showed that anyhow.

"*Q*. Who are you talking about, when in the question that was put to you, you answered ' no, sir '—when you included the objects of his bounty—what did you mean by the ' objects of his bounty ' as used by you in answering that question or used in the question which you answered ?

"*A*. I don't know as I could tell you; I am not expert on those questions. * * *

"*Q*. Did Mr. David Shepard know what property he had ?

"*A*. Why, I couldn't say as to that.

"*Q*. You don't know but what he did, do you ?

"*A*. No. * .* *

"*Q*. Do you mean to tell me now, that you don't know, you don't think he knew what property he had ?

"*A*. Why, I don't say that he didn't know, or don't say that he did. I don't know whether he did or not.

"*Q*. You don't know whether he did or not ?

"*A*. Why, no, I never asked him, and he never told me.

"*Q*. So you don't include that in your answer to the question at all, do you ? Do you or don't you ?

"*A*. No, sir.

"*Q*. Do you think he knew how many children he had ?

"*A*. Yes, sir.

"*Q*. Do you think that he knew that he had given—if

he had given—Alfred Shepard two or three hundred thousand dollars, that he knew it?

"*A.* I think he knew it years before.

"*Q.* He knew it when he saw—when you saw him in 1902, didn't he?

"*A.* Why, he might have; yes.

"*Q.* Don't you think he did?

"*A.* I said 'Yes.'  *  *  *

"*Q.* And he would know if he had given Freedom money, he would know, wouldn't he, about what he had given him?

"*A.* Yes, sir.  *  *  *

"*A.* When I spoke about his not being able in my judgment to make a will, I didn't include in that the fact that I thought he was going to give me something; I had a reason to expect something; I didn't include that reason for expecting something when I spoke about his inability to make a will, the people that I included in my answer to your question a while ago about the objects of his bounty, I included anybody that might have done things for him.

"*Q.* Who was it that you thought had done anything for him?

"*A.* There was myself and Mrs. Simons and the girls around the house there in general.

"*Q.* Those are the ones you had in mind?

"*A.* Why, yes, or anybody else."

This witness also testified about card playing:

"During the period of 1901 and 1902 I have played cards with him when the rest of the folks would want to go away, I would go over there and play cards with him; he was very childish, it used to please him to beat me; I used to let him, I didn't try to play at all.  *  *  *  He never did it with me, but he has with others, when he didn't get a good hand he would throw down his cards and deal over, he never did that with me; I have seen him do it with others.  I never saw him do that so much as he did with Mrs. David Shepard; they used to have their little differences playing cards.  *  *  *  I was there a portion of the time when Mrs. Shepard was alive and Mr. and Mrs. Shepard used to play cards together; they had some controversy about playing cards.  I said that the only controversy I saw with Mr. Shepard playing cards was when he and his wife were playing cards, I never had

any with him.   *   *   *   He knew how to play cards after a fashion.   I knew a little something about it.   We played ' cinch,' I think it was ' cinch,' that is what he called it.   I never had played it until I played it with him. It was just about the same as ' seven up,' high, low, jack and the game, that was about all there was to it.   I think that is ' cinch.'   I don't remember about counting the five-spots.   I never played it only as I played it with him. Then we played ' seven up ' and ' pedro ' some.   I know the difference between ' cinch ' and ' seven up.'   I know ' cinch ' and ' seven up,' but I don't know much about ' cinch.'   I never played it before, and I have really forgotten how the game went.   At any rate, whatever I learned about it he taught me."

A nurse who gave testator three treatments in February, 1901, and who treated Mrs. Simons for five weeks, beginning September 8, 1902, testified:

"Well, physically he was very weak and feeble, and mentally I should say he wasn't bright and active."

Dr. Sands visited Mr. Shepard in his professional capacity, and thought he had a slight paralytic stroke; he observed no symptoms of atrophy of the brain.

"*Q.* State whether or not at that time David Shepard's talk was childish.   Give his appearance in that respect. *   *   *

"*A.* Well, in treating Mr. Shepard, of course it was not a great many times I saw him, and I did not examine him closely as to any nervous or mental condition.   I would say he was of rather a childish condition.   When I saw him at that time of course he did not have much to say.   *   *   *   I know he was feeling badly, and the conditions were that he would not have very much to say. *   *   *

"*Q.* To what extent did David Shepard suffer from uræmic poisoning during 1901 and 1902?

"*A.* Well, during that time I saw him but a very few times, and the uræmic poison did not have any great bearing on his condition.   Of course when I treated Mr. Shepard and called to see him he was an old man, and had the troublous conditions we find old men having, and I did not do much more than treat him and try to relieve the existing symptoms.   *   *   *

"*Q.* Tell us whether in your opinion uræmic poisoning did have any effect upon his mental powers.

"*A.* Well, as far as affecting the mind—that is, the mental condition—I could observe no indications of mental disturbance that I considered the result of uræmic poisoning.   *   *   *   The immediate cause of his death as I diagnosed it was uræmic poisoning and senile paralysis.   *   *   *   I could not say that the senile paralysis was a continuation of the paralysis which he suffered from in 1902. I could not say it was of the same type.   *   *   * I talked with Mr. Shepard very little, and it would be very hard for me to give an opinion as to the amount of will power that he had.   He was a man that got so feeble and decrepit—an old man—very nearly the end of life, and perhaps Mr. Shepard might be more or less childish and easily influenced.   Nothing ever came to my notice to know whether he was specially influenced more than a man in that condition could be.   *   *   *   I did not find that he had any kidney trouble.   The trouble he had would be ordinarily designated as bladder trouble.   *   *   *

" When I was there at various times in 1900 and 1901 I conversed with David Shepard, and I would not say that I found him irrational at all.   When I talked with him I found that he understood what I said.   He talked rationally, as we would expect to find a man of his age; there would not be any irrational talk.   There are few men of that age who do not have more or less of those old people's illnesses.   We find a great many men that do have them and a great many that do not. * * * When I called on the 25th of August, 1902, I was told that he had a sore throat.   *   *   * He seemed to understand what he was talking about and he seemed rational.   I believed that day that he might have had a little stroke.   I remember talking with Mrs. Simons, and Dr. Wattles had diagnosed the case, and she said he did not say anything about any indications of paralysis.   *   *   *   When I treated him in 1903 I talked with him some, inquired about his condition.   He was a man that never had much to say.   I did not discover in any of the talk anything that would strike me that I would consider that he was irrational.   I never saw anything I considered showing a lack of his mental powers; that is, showing a form of insanity or anything of that kind.   I did not see anything but what I would ordinarily expect in a man of his age, except when he was sick he did not talk very much."

There was also testimony to the effect that on a few occasions testator selected the wrong hat at the barber shop, and that once he wore one home not so good as his own and kept it; that occasionally he appeared not to recognize a person with whom he was acquainted; that he forgot that he had ordered the garbage can taken away, and wrote asking why it had been done; that he occasionally forgot his promise to order things for the house; that he forgot that the barber had given him his change; that he made a greater percentage of errors in bookkeeping in 1902 prior to August 13th than in previous years.

The accountant, who testified as to the errors and who adopted as the basis for his accounting contestant's claim that his father was acting throughout as the agent of his sons, who were absolute owners of the property, testified:

"Cash items 583 and 584, posted by David Shepard to Alfred Shepard's account, this has never been corrected, but belongs in the joint account. * * * Cash items 588, 589, 593, 614, 616, were posted by David Shepard to the joint account, they should have been divided and posted to Alfred Shepard's and Freedom Shepard's account. * * * In 1902, from January to August 13, twenty entries were made by David Shepard and five errors appear. * * * Cash items 588, 589, 593, 614 and 616 refer to bonds. I gave five errors occurring in 1902 up to August 13. The items all refer to bonds. I have called your attention to all the errors that I found in the posting. While he carried these items to the joint account so far as I remember he carried the amounts over correctly in the ledger. I have made a very careful examination of this matter and as far as I could discover them, made a correct account of the errors I found."

It is apparent from the record that the principal witnesses for contestant, perhaps for the reason assigned by Lloyd, that the testator did not recognize in his will those who had done things for him, were prejudiced against proponent's case, and represented David Shepard in the most unfavorable light. Several of them speak of him in general terms as childish, but the basis of their

testimony is almost wholly his physical weakness, the alleged stroke of paralysis, and lay great stress upon his conduct while playing cards. It is clear that the first stroke of paralysis was so slight as to escape the attention of Dr. Wattles and Mrs. Simons, who called Dr. Sands to attend testator for sore throat, and Dr. Sands' testimony casts no suspicion upon testator's mental competency, but indicates his competency. So far as the card-playing exhibitions of childishness are concerned, there were the same exhibitions, according to Lloyd, during the lifetime of his wife, in the spring of 1898, when, by universal consent, he was entirely competent. Furthermore, there is no pretense that he did not play the games correctly, whatever may have been the degree of skill exhibited. Miss Simons taught him to play the game of solitaire, which he learned in a short time, and her testimony carries with it the assurance that if he had failed at any time to play it correctly she would have disclosed that fact. He certainly was a more apt pupil than Lloyd.

Mr. Shepard was a very taciturn man; he was afflicted with a bladder trouble; had spells of sickness when he suffered, and was far from being at his best; his physical strength was gradually declining, and doubtless he was feeble as compared with the days of his mature vigor; but no witness states any conversation with him which was irrational or showed disconnected trains of thought or failure to comprehend the subject under consideration, and the testimony of contestant's witnesses who were familiar with his life and transactions during the period in question is conclusive, from omissions and admissions, that he was competent to make the will in question. Viewed in the light of their entire testimony, the vague opinions as to childishness and the trivial illustrations thereof become inconsequential, and, taken singly or combined, present no question of fact for the consideration of the jury. Doubtless the jury would have had no hesitation in affirming the testator's competency, if the question had been submitted to them on the testimony of the wit-

nesses who testified from their observation, transactions with and knowledge of David Shepard. But contestant's case was not rested upon any such testimony; on the contrary, weeks were devoted to an examination of the books and papers of David Shepard and of his sons, for the purpose of proving contestant's claim that the property transferred to Freedom in August, 1902, belonged to Freedom and Alfred jointly and some of it to Alfred individually, and that from such fact the jury would be warranted in inferring that David Shepard was mentally incompetent to comprehend the extent of his property, and hold it in memory a sufficient length of time to dispose of it without prompting.

Prior to 1896 David Shepard had given considerable sums to his two sons. About the 8th of October, 1890, Alfred was sent for by Freedom and came to Battle Creek, when certain securities were given to them by their father.

"Father gave to Freedom the ones that were assigned to him, and to me the ones assigned to me, and I took mine home and Freedom took his home. Freedom had a total of $63,321.43. The value of the securities given me was $63,311.30. * * * I took my securities home in a grip. After I took those papers away about October, 1890, I never put them back into my father's possession. He had nothing to do with handling or collecting them and exercised no control over them after that time."

In 1896 some kind of an arrangement was made between testator and his sons involving a plan for the disposition of the bulk of his property. According to Alfred, the transaction consisted of an absolute gift of certain securities to each son and of others to them jointly, and, where necessary, formal assignments were made. He testified:

"After the papers were arranged and gotten into shape they were put into two baskets. My brother insisted on having a formal delivery. My securities were put in one basket and Freedom's securities were put into another basket and the joint securities were handed to us separately—that is, together. My father took one basket in each hand and said to Freedom, 'I give you these,' and

said to me, ' I give you these,' and the company bonds he made a regular formal delivery. * * * After that had been done we put the securities right back in father's safe, and he was to act for us. * * * After the securities were handed and given to us I put them back in the safe. Father said he would like to have something to do, and we knew he had been an active business man and we concluded to leave them there and he was to handle them for us. * * *

"Q. Now, he wanted to give you all the property he had?

"A. That was about the size of it.

"Q. That was what you understood?

"A. That was about the size of it.

"Q. He was going to give you all his property?

"A. I won't say that he wanted to give us all his property, Mr. Mechem.

"Q. What was he going to hold out?

"A. He was going to divide his property between Freedom and I.

"Q. He wanted to divide all his property between Freedom and you?

"A. That was the way I understood it. * * * After these papers were taken out and put in the baskets I think father had some notes in the safe, Nichols & Shepard's notes. I cannot tell how much they amounted to. I knew pretty near what was in the safe at the time, but I cannot remember now. He had those notes and he had his real estate, that is all I can remember. * * * I think all this time that we were working there, making these lists, figuring up the interest and making the assignments and getting this contract prepared the whole matter was concealed from mother, we didn't care to have anybody know it. * * * After all these assignments were made I took the ones that belonged to me and the ones that belonged to the joint account and kept them with me. I didn't put them on record. Freedom took those that were left with him. So far as I know when any of the mortgages that had been assigned to me in December, 1896, were paid father discharged them. I cannot recollect any that he did not. So far as I know I would send it and have father discharge it and save the recording fee of recording the assignment. So far as I know that was what it was done for, to save the recording fee. * * * It was one of the matters I had in mind during this trans-

action and talked between me and father before making these assignments and transfers of property that it would be unnecessary, in case of his death, to go through the probate court."

In 1899 transfers were made of certain stocks, which contestant claims were intended to and did transfer the absolute title thereto to the respective sons. These certificates were initialed by the son's wives.

"When these certificates of stock were given to us they were given out of his own hand. I suppose he got them out of the safe. * * * The writing of the assignments on the backs of the certificates was done by father. * * * After father had written the assignments he said he gave them to us, that was about all he said. * * * After the papers were given to us I took them out and made a list of them and put them back in the safe. I don't know as I have got that list. Father didn't reserve anything out of that in any way; simply gave the whole thing to us. There was no understanding or agreement that he was to have any part of it. There was no understanding that they were to be left in his safe. I left these certificates in father's safe simply because it was my place of business. * * * My recollection is very vivid that these papers were given to us, but in a kind of way my recollection of about everything else in connection with that transaction is very faint. * * * I don't know as I ever spoke to father about the transaction after that. The different stocks paid dividends. I didn't ask my father to pay me the amount of the dividends. He could have them if he wanted them. Some of the dividends appeared on the books when they were paid. I should say all of them did. I think the books show he was collecting dividends. I didn't ask him for them. If he wanted them he could have them. I would not take anything from my father if he wanted them. * * *

"Q. Now, to what fact was she knowing that her initial witnessed?

"A. She knew it was done and we adopted that in 1896; all the bonds given in 1896 are witnessed in the same way by Freedom's wife and my wife putting their initials on them.

"Q. And for no other reason?

"A. I don't know what other reasons there were.

"Q. Was there no other reason about it at all?

"*A.* I don't know as I can give you a particular reason for it; it was a sort of identification, you might say. * * * I instructed my wife to put her initials to it because it has been our custom. On the certificate of the National Bank there was a complete transfer witnessed by my daughter. The addition of the initials of my wife would not add anything to the force or effect of the transfer. * * * The subject of the inheritance tax might have been talked between Freedom, my father, and myself in connection with these papers, but I don't recollect it. I don't recollect any talk that if father died these stocks might be transferred without paying that inheritance tax. I have no distinct recollection that there was not such a conversation."

Freedom testified as to the 1896 transaction:

"The matter was talked over by Alfred, father, and myself at my house. His idea was to fix his property in such shape so when he got through with it we could take it, and there would be enough left of the estate so that the old will would provide for mother. * * * It was said between father, Alfred, and myself that this arrangement was to take effect at father's death. There was an agreement between us as to how this was to be carried out. * * * It was agreed between father, Alfred, and myself that lists were to be made of all the property that would be going to Alfred, and of all the property that would be going to me, and there was some property that we felt was a little doubtful, and that was assigned or fixed to come to us jointly. * * * As talked over between father, Alfred, and myself, after the assignments had been made, and the bonds marked, and the list made, father was to take the securities home with him and handle them as he always had before. He was to do the collecting of them, and do with them just as he had a mind to. That arrangement was to continue as long as he lived. I cannot state the exact words, it is too far gone by, but the substance of it was that at his death we could take those papers and they would be outside of his estate, and we were then to put the assignments on record. Separate assignments were made so we could put on record those that were not paid on; he might collect some in the meantime before he died."

As to the 1899 transaction he testified:

"There was something said by father in regard to when these assignments should take effect. I noticed there were no revenue stamps on them, and I asked him if he did not want to put revenue stamps on them and he said he could do that when he got ready to pass them over. At no time when I was present did father make a delivery of those papers. After this transaction, when father showed them to me and asked if they would do, I think he gathered them up and put them in the safe. I did not take them with me.  *  *  *  The object of my wife and Alfred's wife putting their initials on the corner of the stocks was that they understood it was not to be passed over until his death, and I asked them to put it on there when father said we could put the revenue stamps on when he got ready to pass it over."

On December 29, 1896, the sons entered into a written agreement with reference to the property as though it was their own property, providing for annual settlements and the protection of their interests therein and the division thereof. This contract was not signed by the father, and it is noteworthy that it makes no reference to his acting as agent or in anywise representing them in handling the property.

In December, 1896, Alfred Shepard wrote certain letters concerning this matter. The letter of December 7th to Freedom contains the following:

"Let father have the entire control and management of the business the same as he has now—receive the payments and reloan the money in his name and assign the new papers to us jointly as long as he lives or wants to, until each of us are satisfied that it is best for us to manage it. In any case he to have the entire income from it, or as much of it as he wants."

The letter to Freedom, of December 12th, contains the following:

"*Freed:* Will you join me in asking father to destroy all of the assignments he has made to either of us within the last thirty days of the notes and mortgages and notes secured by trust deeds, and what is known on his inventory as his Mo. Mich. Ind. and So. Dakota papers, and ask him to assign them to both of us jointly so that we

shall own them together? If he is not equal to the task—Will you assign over to me a one-half interest in all of the above-mentioned securities that were assigned to you if I will assign over to you a one-half interest in all of the above-mentioned securities that were assigned to me—so that we shall both own them together and jointly? I think that we are both willing and agreed—That we shall let father handle them as long as he wants to do so, or until we should both become satisfied that it is best we should do it ourselves, he to have the income from them or so much as he wants. I am willing. * * * In case he should adopt this way I would prefer that after he assigns and delivers them over to us that we hand back to him all or such part of the securities he may like, with written authority to cancel such part of the securities he may wish in case of our or either of our deaths before his. This would preserve his maintenance, and it would be thrown into our estates when he is through with it, and the gift to both of us of that part he should cancel would be void or transferred back. His income to be taken out of the earnings, income and proceeds derived from all the property and securities. Whenever he wishes to surrender the care and management of any part or all of the property, then so much as he surrenders shall be divided in kind equally between us so far as it is satisfactory to both of us, and what cannot be so divided shall be held by us jointly and together, and divide the proceeds when paid and finally disposed of. At his decease and motner's decease we shall immediately divide the cash and treat the balance of it as above-mentioned."

On December 15th he wrote the following letter to his father:

"*Dear Father:* I have thought that matter all over carefully and I am fully convinced that this is the way to have it done. I talked with Mr. Wadleigh, the atty. about it. He thought as I did & said that it was the way John De Shon's estate was fixed & with 8 heirs, & there was no trouble or friction. My plan is this & I will agree with Freed to have it done so: Have all papers & securities assigned & transferred & delivered to us jointly, all of the last lot of assignments made last, & this month to be made to comply with this form, which we agree to do. You to have so much of the income & management of the business as you desire as long as you can do it. At your

decease we to pay mother three hundred dollars each month as long as she lives & divide the papers and securities as nearly equal as we can—those that we cannot so divide & when they are paid and disposed of then we will divide the proceeds—all to be done equally, share and share alike. If you prefer instead of the income and management of the business we will pay you each year in quarterly installments five thousand dollars a year as long as you live.

"ALFRED SHEPARD.

"I will agree to the above.
"I will agree to the above."

It is apparent from the letters and from the testimony of contestant that the transaction of 1896 extended over several weeks, and that the nature of the arrangement between the father and the sons was under consideration. The letters of contestant indicate in the strongest manner that the transaction being thought over carefully involved a transfer which, though apparently absolute, was in reality only to divest his father of his interest in the property at his death. Freedom says that this was the proposition substantially agreed to, the material change being that the property was to be assigned to them severally instead of jointly. It is apparent that if this was the agreement the books, like the assignments, would be designed upon their face to show a fully executed transfer, so that upon the death of the father the title of the sons would appear to be vested, and the expense of probate proceedings and inheritance taxes avoided. The books, therefore, showing fully executed transfers, are not inconsistent with the claim that the transaction was in its character testamentary. Neither is the conduct of the parties inconsistent with the agreement as claimed by proponent. It is conceded that the securities were immediately handed back to the father; the assignments were not recorded; he collected and discharged mortgages; coupons on bonds were sent to him and collected; he collected dividends and voted his stock. In short, he did as contestant testified he was to do, "to reinvest it the same as if it was his own property."

In 1890 Alfred took his securities home in a grip, and never put them back into his father's possession.

"He had nothing to do with handling or collecting them and exercised no control over them after that time."

The initialing of the securities had no significance whatever unless it was to indicate that there was something unusual about the transaction. He took notes and mortgages in his own name. He collected and used dividends. He used the interest on the $50,000 note. "He didn't reserve it, we just let him have it," contestant testifies. The conduct of David Shepard throughout is inconsistent with the theory that he understood that he was an agent for his sons, converting their property to his own use and laying himself liable to a charge of embezzlement. The history of his long and honorable life as presented by this record is at war with such a conclusion. His use of so much of the property as he desired for his own purposes is consistent with the theory that the arrangement which contestant had thought "all over carefully" was, as indicated by his letters, testamentary in its character. This collateral issue as to the ownership of the securities was made the principal issue in the case, to the overshadowing of the real issue as to the mental competency of David Shepard, and the trial became a contest between the two brothers. Their rights have been litigated and determined in the court of chancery, which was the proper forum for such determination.

There is no doubt that the fact that a testator disposes of property not his own may be considered, in connection with other facts tending to impeach his mental competency, in determining whether he was incompetent to make the will, and, in connection with other facts tending in the same direction, may be admissible upon the question of undue influence. But where, as in this case, the direct testimony of the witnesses for proponent and contestant and all of his transactions, in the light of the surrounding circumstances, conclusively demonstrate the testator's

mental competency, and the showing as to the disposition of the property is at least as consistent with a lawful as an unlawful disposition, we do not think such showing, standing alone and unsupported, is sufficient to warrant submitting to the jury the question of mental incompetency. *Fraser* v. *Jennison*, 42 Mich. 206 (3 N. W. 882); *O'Connor* v. *Madison*, 98 Mich. 183 (57 N. W. 105); *Hibbard* v. *Baker*, 141 Mich. 124 (104 N. W. 399); *Blackman* v. *Andrews*, 150 Mich. 322 (114 N. W. 218); *Leffingwell* v. *Bettinghouse*, 151 Mich. 513 (115 N. W. 731); *Clark* v. *Ulrich*, 153 Mich. 695 (117 N. W. 329).

We are also of the opinion that there was no competent evidence of insane delusion to justify the submission of that question to the jury. *Bean* v. *Bean*, 144 Mich. 599 (108 N. W. 369).

**Undue Influence.** The burden of proof is upon the contestant to establish undue influence. *In re Loree's Estate*, 158 Mich. 372 (122 N. W. 623). And the mental condition of the object of the alleged influence is an important factor in the determination of the question. Experience has demonstrated that the right to make or change wills is the most effective means possessed by old and infirm people to enable them to secure, even from their children, at times, the care and service which they require. While, as we have frequently held, direct and positive proof is not required, and the question must usually be determined upon circumstantial evidence, such evidence should be sufficient to reasonably justify the inference that the mind of the testator had been dominated and overcome by the mind of another or had been deceived and misled by fraud and craft. As we have already held that there is no evidence justifying the conclusion that the testator's mind was affected by any insane delusion as to his sons, and that he was thoroughly competent to make his will, it is from this standpoint that we are to consider the question of undue influence and fraud. It is apparent that in such a case the evidence should be convincing in a high degree to warrant the annulling of

the product of an unquestionably competent mind. The evidence relied upon to establish the charge is, in brief:

The statement in the paper drawn by Mr. Wadleigh, and signed by the testator on August 2, 1902:

"I further state that he (Freedom) has never at any time requested me to make any of the said transfers, and has never sought to influence me in regard to the same, but all the same are made by me on my own motion, and being the final disposition I desire to make of the said property."

The claim that:

"Beginning with the trouble over the Hofer loan at Christmas time, 1900, and continuing down through the balance of the life of David Shepard, Freedom was continually making statements to his father about Alfred and threatening Alfred with arrest."

That when the house was painted in 1903 testator wanted it the same color as previously, but Mr. and Mrs. Freedom Shepard wanted it a different color, and it was painted as they wanted it. That testator had promised Mrs. Simons not to ask her to sign any papers as a witness that would in any way bring her into any family trouble, and when she signed the will as a witness she was not advised and did not know that it was a will. That on one occasion Freedom was heard to say to his father, referring to Alfred, "What shall we do with this man, he acts like a child."

The testimony of Ransom Lloyd:

"During the last two or three years of his life, I never heard Freedom Shepard say anything to his father about Alfred, except I used to hear him ask his father if he had heard from Alfred, or 'Have you heard from Molly?' (Molly referred to Mrs. Alfred Shepard.)"

That Freedom's expression and voice were peculiar and different from former years. He noticed this perhaps a half dozen times. That testator told him he wanted to sell certain lots, but on Lloyd finding a purchaser, "he said he didn't want to sell them, that Freedom wanted

them. He said that Freedom didn't want him to sell them."

That in 1899, when the driveway was being repaired, Freedom was unable to influence his father as he did about the painting in 1903; that a month or so later he insisted on having the hired girl eat at his table, against Freedom's criticism; that in 1898 testator told Freedom he need not interfere with his plans for placing the radiators, that he did not care to be dictated to, and would have it put in to suit himself. That Freedom had every opportunity to exercise improper influence over his father.

Finally, as stated in contestant's brief:

"In addition to the foregoing, we have the overwhelming proof in this case that the gifts of 1896 and of November 8, 1899, were valid ones, and were made under such circumstances as indicate, beyond question, the intention upon the part of David Shepard to make those gifts. We have also the treatment of these various gifts by David Shepard himself after they were made, and his continued and repeated recognition of them as gifts. It is the claim of the contestant that Freedom, under the evidence, is clearly responsible for the mental attitude of the father toward Alfred at the time of the making of this will, because of the various and repeated suggestions and statements that were made by Freedom to the father, and based upon the testimony of Mrs. Freedom Shepard who says that upon the 4th day of August, nine days before the making of the will, the father mentioned to her that he thought Alfred was dishonest, and he made that statement as a reason for making the gift of certain property to Freedom individually (which it is claimed by contestant had been previously given to the two sons jointly), the position of contestant that undue and improper influence was used upon David Shepard is amply justified."

The controversy between the sons over the Hofer loan arose during the holiday season of 1900, and related to the extent of their respective interests therein. The amount of the loan was $17,000, of which Alfred furnished $7,000 of his own money and David Shepard furnished $10,000.

Alfred claimed that $2,000 of the $10,000 was furnished to him and $8,000 was furnished on the joint account of himself and Freedom. Freedom contended that the $8,000 was furnished to him. The dispute having become heated, the father was called in to give his opinion. No one disputes his entire competency at that time, and he was the person best qualified by knowledge of the facts to determine the controversy. He told Alfred that he thought Freedom was right, and then, as Alfred testifies:

"I took the Hofer loan papers that I found in the safe and put them in my pocket. They never went back into father's possession. I said, 'I will attend to these myself.' Just prior to that time father had expressed the opinion to me that I was mistaken as to my attitude in regard to that loan. I claimed that I had an interest of $9,000, and $8,000 was in the joint account. I said that to Freedom, I don't know whether father was present at that time or not. I don't think he was. I didn't make any explanation about it to father. I never after that attempted to explain to father what my attitude in regard to it was. I don't think father knew then that I had taken the papers away. I presume he knew after. I didn't make any explanation as to why I had taken the papers away.   *   *   *

"When we were looking over these accounts in the Christmas season of 1901, I would be at work in there, and Freed would come in and want me to assign him one-half of this Hofer loan, and he would pay me one-half of it. Freed wanted me to assign him one-half of the mortgage and he would pay me $500, and I went to work and made the entry here; this is on my individual account, page 277 of the ledger. I made the entry: "By Joseph Hofer loan, $17,000, less $500 paid Alfred Shepard by F. G. Shepard so that each will own it jointly, one-half of it,' and I carried the $16,500 out and that was erased. He didn't pay me the $500 at that time, and I erased the entry. When we separated there were no particular words between us, but there wasn't a friendly feeling. I made that erasure in the Christmas season of 1901. After that time he and I didn't try to adjust our matters."

On the same occasion he conceded Freedom's claim, "on account of father, not because it is right." Never

having made any explanation to his father about it, his father certainly had a right to believe that he acknowledged the correctness of his decision.

Freedom's threat to arrest him was in connection with his taking away the papers. This dispute appears to have been the beginning of an unfriendly feeling between the two brothers, and their father had a right to believe that Alfred was responsible for that feeling.

Prior to the Christmas season of 1903, contestant testifies that his father had received him in a friendly and affectionate manner. He testifies that at this season of 1903 he noticed certain erasures on the books and the absence of certain notes from the safe.

"I says: 'Father, where are those notes?' He says: 'Over to Freedom's, over to Freedom's; he does my business now, and I says, 'Where is the $26,000 of notes?' and he says, 'Freed is doing my business now.' His tone of voice when he said that was one I never have heard him use before in my life. * * * Before that time when my father said what he did to me, I had never spoken a word in anger to him in his lifetime and he never had to me. I says to father, 'Father, have you any idea I have ever wronged or attempted to wrong you at any time out of any money?' and he answered in that tone of voice, 'You won't find out by me.' And I says, 'I will give you $100 if you will tell me of one penny.' He says, 'Well, you won't find out by me,' and he went over and laid down and said it tired him to talk about it. I have given the whole conversation, as near as I can recollect. I think this was after lunch, and I got my things together, and I said to him, 'Father, you are the first man that ever called me dishonest,' and I shook hands with him and went away and stayed down town until train time. * * * At the time during the Christmas season of 1903, when I asked my father if I had ever wronged him out of any money, he says, 'Yes, yes, two or three times,' in a high tone of voice, and I says, 'Tell me what it is,' and he says, 'Well you won't find out by me.'"

There is not a syllable of testimony in the case of any statements of David Shepard to indicate that the alleged poisoning of his mind by Freedom had had any effect

upon his attitude towards Alfred.  On the contrary, his treatment of him had been uniformly considerate, kind, and affectionate down at least to the occasion in December, 1903, when Alfred sought a quarrel with him.  There is no evidence of any threats made by Freedom against his father or of any domination of his mind by Freedom. The trivial incident of the painting in 1903, relied upon to show a change in Freedom's influence over him, if it needed any explanation, is easily explained by the fact that at that time Freedom owned the house.  The absence of proof of Freedom's machinations and control over his father, and the trivial incidents brought forward, is certainly very significant, in view of the fact that he was constantly surrounded, by witnesses who would have been swift to bring them to the light if they had occurred.

Mr. Wadleigh's testimony shows that the paper explaining that the transfers to Freedom were upon the initiative of David Shepard was drawn at the request of David Shepard.

"Mr. Freedom Shepard and Mr. David Shepard were there, and Freedom said that his father had had a talk with him, and wanted him to draw up some kind of a statement relative to those transfers of stock and property, showing that it was the work of him, David Shepard, and without the knowledge of Freedom.  I don't know as I can give the exact language, but that was the substance as I remember it; and I then had a talk with Mr. David Shepard, and found that he wanted such a paper drawn, and he directed me to draw it.  He seemed to be rather urgent to have it drawn."

In the case of a man of feeble mentality, in conjunction with other evidence, such an occurrence might afford reasonable ground for suspicion.  In the case of a man like David Shepard, as this record presents him, it affords cogent evidence of the absence of undue influence.  Unfortunately, David Shepard can only speak through the mouths of others and through written declarations such as this, and his will and those written testimonies of a competent mind are entitled to credit, until some substantial

evidence impugns their veracity. He was under no delusion as to his sons. He knew them better than any one else. He told contestant's witness Werstein that Alfred was pretty shrewd, a good business man and making money; that he was engaged in the chattel mortgage business; that "Alfred was pretty sharp and that he was making money and was sometimes too sharp." Mr. Nichols testified that from a conversation he had with Alfred he understood that his father disapproved of what he did in connection with certain Tulare county bonds where Alfred insisted upon his strict legal rights.

The will does not present a case of an unnatural disposition of property. David Shepard had made both his sons rich men. Alfred was sharp and shrewd and making money fast, as his father understood, though Alfred did not see fit to confide in his father the extent of his wealth. From his remarks to Werstein, he did not entirely approve of Alfred's sharpness, but considered that it sometimes went beyond the bounds of justifiable business shrewdness, and lost sight of the rights of others. The only time he ever intimated that he thought Alfred had wronged him out of any money was in response to Alfred's nagging inquiries the last of December, 1903, long after the making of the will in question. There is no evidence to support an inference that Freedom had implanted any such idea in his mind. He was entirely familiar with the circumstances himself and competent to weigh them and judge of their effect. In our opinion, there was not sufficient evidence of fraud and undue influence to warrant the submission of the question to the jury.

The judgment is reversed, with costs against contestant personally, and a new trial granted

HOOKER, MOORE, McALVAY, and BROOKE, JJ., concurred.