## LUTZ v. ROHN.

### SPANIER v. ROHN.

DEEDS—UNDUE INFLUENCE—EVIDENCE.

Evidence *held* not to sustain the decree and finding of the circuit court that defendant procured by undue influence and improper means the change of beneficiary in her husband's policies of insurance, or wrongfully obtained the execution to her husband and herself of a deed by the entirety conveying certain of his real property.

Appeal from Wayne; Donovan, J. Submitted April 18, 1911. (Docket No. 28.) Decided November 3, 1911.

Bills by Marie Lutz against Mary Rohn and others, and by Anna Spanier and Frederick Rohn against said defendants to set aside certain deeds and the transfer of beneficiary under certain policies of insurance of Joseph Rohn, deceased. From a decree for complainants, defendant Rohn appeals. Reversed and bills dismissed.

*Schmalzriedt, Spaulding & Herald*, for complainants.

*James H. Pound*, for defendant Rohn.

MOORE, J. The two bills of complaint in these cases were filed to set aside conveyances made by the late Joseph Rohn, who died December 29, 1909, to the defendant Mary Rohn, his wife, on the ground of fraud and undue influence. Complainant Mrs. Marie L. Lutz was a stepdaughter of Joseph Rohn, and up to about the time of his marriage to defendant, September 16, 1909, was named as the beneficiary of two fraternal insurance policies on his life, one for $1,000 in the Schiller Bund and one for $500 in the German order of Hari Gari. These certificates were surrendered by him and new certificates issued in favor of defendant Mary Rohn in September, 1909. The bill prays that the reissued certificates be set aside, and that the complainant as beneficiary in the original certificates be declared entitled to the proceeds of the insurance. The complainant Mrs. Anna Spanier is the daughter, and Frederick Rohn, who was originally made a defendant, but afterwards, by order of the court, joined as a co-complainant, the son, of Joseph Rohn, and the two, together with defendant as widow, are his only heirs at law. Joseph Rohn was the owner of a house and lot on Brandon avenue in the city of Detroit. On September 16, 1909, the day of his marriage to defendant Mary Rohn, he executed a deed of the real estate to defendant Charles P. Grosfield, who immediately reconveyed to Joseph Rohn and Mary Rohn, his wife, as tenants by entireties. Mr. Grosfield disclaims any interest in the property. The bill prays that the deeds be set aside, and the

property decreed to belong to the estate of Joseph Rohn. The grounds of both bills and the evidence in support of them being identical, the two cases were consolidated at the trial and heard together. The circuit judge granted a decree according to the prayer of the bills of complaint. The case is brought here by appeal.

The deceased, Joseph Rohn, at the time of his marriage to the defendant Mary Rohn, was 57 years of age. She was 10 years younger. He was born in Prussia, and had lived in Detroit 17 or 18 years. His first wife was the mother of Mrs. Spanier and Frederick Rohn. His second wife was a widow with six children by her former husband, one of whom was Mrs. Lutz. After the death of his second wife in February, 1908, Mr. Rohn made his home with Mrs. Lutz until about September 1, 1909. In July or August, 1909, he became acquainted with the present Mrs. Rohn, who had twice before been married, and was a divorced woman with seven children by her first husband. All of these children lived with her at her home, which was directly in the rear of the home of Mrs. Lutz; only the alley being between the two properties. The defendant Mary Rohn was also a native of Prussia. The evidence indicates that some differences arose between Mrs. Lutz and her stepfather Joseph Rohn, and he commenced to live at the home of Mary Rohn, who also had at least one other boarder besides her grown children. About the 1st of September Mr. Rohn and the defendant became engaged and were married before a magistrate on September 16th. It had been their plan to be married on September 14th, but it is claimed the defandant had trouble in having her wedding outfit ready at that time. Plans had been made for a wedding celebration on September 14th, and, as the food and other refreshments had been prepared, the wedding celebration was held at that time.

It is the claim of complainants that Joseph Rohn was plied with intoxicating liquors at that time, and that Mrs. Rohn also became intoxicated, and that while he was in

that condition the transfers of the certificates of insurance and of the real estate were made.   In December Mr. Rohn was taken ill, and on the 14th of that month a doctor was called.   He made two or three visits, but found nothing serious the matter.   Mr. Rohn was not able to go to his work, but was about the house.   On the morning of December 29th, when Mrs. Rohn, who was busy with her washing, her invalid son John, and her husband, were all in the kitchen, Mr. Rohn complained of not feeling well, and went into the bedroom.   Shortly thereafter it is the claim of Mrs. Rohn that she went into the bedroom, and that Mr. Rohn's appearance was such as to greatly alarm her, and that, as her son was not able to go for the doctor, she did.   When the doctor arrived, Mr. Rohn was dead. The doctor thought he discovered indications of diluted carbolic acid poisoning, and the coroner was notified.   An inquest was held in the presence of the assistant prosecuting attorney.   The county physician and the coroner were of the opinion that there was carbolic acid in the stomach of the deceased.   The stomach was removed by the doctor, and sent to Dr. Clark for analysis.   Dr. Clark was not sworn as a witness.   The result of the analysis is not shown.   The analysis was not introduced in evidence. The record is silent as to the verdict of the coroner's jury, and it does not appear that any arrests were made.   There is nothing in the record to show that the relations of Joseph Rohn and the defendant were meretricious before their marriage.

It is the claim of the complainants that defendant Mary Rohn by her dominating will secured the conveyances which they seek to set aside, and that she then slowly poisoned her husband by administering to him carbolic acid in the whisky he drank, and caused his death.   These are grave charges, and, before they are sustained, should be based upon some substantial proof.   There is testimony on the part of complainants that Mr. and Mrs. Rohn sometimes drank more than was good for them, and that

167 MICH.—21.

he sometimes became drunk, and that Mrs. Rohn urged him at times to drink. No proof is given that Mrs. Rohn ever asked him to make these conveyances, or that he did not make them on his own motion, except the testimony of one woman who was living apart from her husband, who testified as follows:

"When I went in the back Mrs. Bruski asked me if I had any money for a can or a bottle.

"Q. You mean Mrs. Rohn?

"A. I said I did not have any money, and she said, 'Have you got 10 cents?' and I said, 'I have 10 cents if you want it. I will give it for beer, and not for whisky.' And her daughter Anna went and got a can of beer and a bottle of whisky, and then she was telling me the story about her having, how many husbands she had, and she told me she had had Mr. Bruski, and she said she was not satisfied with him, and she fired him out, and then she was married to Mr. Kasmareck, and she said, when she got his money, she fired him, and then she married Mr. Rohn, and I asked her how it is she has such luck in getting married, and she says that she was the seventh sister in her family, and born with a veil on her face, and she say, 'That is how I have such luck; I can get a divorce and fire one and marry another.'

"Q. Did she give you any advice about your husband?

"A. I think on Monday or Tuesday I was down there and as she was in bed late, and she said she was sick, and I went in the bedroom, and she asked me if I would give 10 cents for whisky and I did give 10 cents. Not for whisky. Her daughter went for it, and she went after it, and she drank two glasses out of it and her daughter one, and I think one of the sons was in there and had a glass of whisky, too.

"Q. What was it she said about trouble with your husband?

"A. I was parted with him, and at the time.he accused me of being filthy when I was not, and she told me my husband talked very bad about me.

"Q. What was it she advised you to do?

"A. She advised me to do away with my man, and I says, 'You would not give him anything to get rid of him, in a short while,' and she says, 'Any kind of poisoning, carbolic acid,' she says. 'Marry a man like I did that has lots of money,' and this was the same day that

she told me that she would never have married Mr. Rohn. She said the three weeks that she had lived with him before he signed the money—and she would not live with him.

"*Q.* Tell that again.   I do not think that is quite clear.

"*A.* She told me it was less before.

"*Q.* That is right.   You started right.

"*A.* She told me that she lived with him three weeks before she married, and she would not have married him until she got the money signed on her or she would not have married him.   But sooner—   And she told me that he signed the house to her and $1,500 insurance.

"*Q.* Did she say anything more about poisoning at the time?

"*A.* Well she was telling me the day that I was there, the day that I told you I went through the alley, and she says she is married to this man, but she thinks he will not live long.   Well, I did not like to say because I did not like to get so far in anything.   I did not want to do that. There is only one person there.   It is not right for me to tell it.

"*The Court:* I want to know.   It is for me.

"*A.* She told me she was going to give him a dose of carbolic acid, and she told me 'I was not living with my man.'   That my husband wanted her son to swear against me, and he would give him $50, and she says, 'If I was you, I would poison him the same way I am going to;' and that is what she told me.   *   *   *

"*Q.* Was there anything said more than you have already said about who was boss?

"*A.* Mrs. Bruski always said that she was boss and she was going to be boss, and she did not want anybody else to be boss of her house.   That day when I walked out of the house and by Daniel he is right there.   I said he should go in the house and make them stop, and not let them fight that way, and he says, 'Let her show who is boss."

"*Q.* Was there anything said between Mr. and Mrs. Rohn about who was boss at the time the fight was going on?

"*A.* Yes, sir.   She hit him, and then she says, 'Now tell me who is boss?'   I do not know how many times, and he says, 'You are boss.'   But I do not know how many times.   But he said it in German.   He could hardly speak."

The further examination of this witness showed she

was not on friendly terms with defendant; that she did not warn Mr. Rohn of his peril, though she saw him 10 or 12 times after the alleged conversation; that she knew the police pretty well; that she did not tell any of them.

"I did not tell anybody. I never told it to my father until today in this courtroom."

She was a witness at the inquest, and said nothing at that time about the poisoning. The record shows that it was admitted that this woman was at some time arrested and convicted of disturbing the peace, and that sentence was suspended. Testimony was introduced tending to show improper relations with a man not her husband, which may or may not have been true. We are satisfied from a reading of her entire testimony that it is not entitled to very much weight.

The record discloses that, when Joseph Rohn took out the certificates of insurance, his second wife was named in them as beneficiary. When she died and he went to live with his stepdaughter Mrs. Lutz, he surrendered the certificates, and new ones were issued in which Mrs. Lutz was named as beneficiary. When married the last time, he again surrendered them, and had the defendant Mary Rohn made beneficiary. In view of the fact that Mrs. Lutz was no blood relation of his and was a married woman having a home of her own, that his son Frederick Rohn was an adult and his only son, and had enlisted against his father's wish, and had absented himself from home since he was 18 or 19 years old, and was still away at the time of his father's death, the arrangement made by Mr. Rohn would seem to be a natural one. Mrs. Rohn denies all the damaging accusations made against her. Her grown children who lived with her and an adult boarder who lived with her from the time she married Mr. Rohn until his death say they were always kind to each other.

The secretaries of the two societies whose certificates were transferred say it was done at Mr. Rohn's request, and that he understood perfectly what he was doing.

One of the secretaries visited him several times during his last illness and was alone with him, and no suggestion was made of regret at his marriage, or the change of beneficiaries. Felix A. Lemkie, who had been a magistrate in Detroit 30 years, who performed the marriage ceremony, testified the parties were not under the influence of liquor at that time. The scrivener who drew the deeds had been alderman of his ward and State senator, and says the deeds were drawn as Mr. Rohn desired them drawn, and that he understood fully what he was doing. We think the case has completely failed on the part of complainant. See *Palmer* v. *Mason*, 42 Mich. 146 (3 N. W. 945); *Schofield* v. *Walker*, 58 Mich. 96 (24 N. W. 624); *Fraser* v. *Jennison*, 42 Mich. 206 (3 N. W. 882); *Prentis* v. *Bates*, 88 Mich. 567 (50 N. W. 637); *Hodges* v. *Cook*, 93 Mich. 577 (53 N. W. 823) *Hammond* v. *Welton*, 106 Mich. 244 (64 N. W. 25); *Geer* v. *Traders' Bank of Canada*, 132 Mich. 215 (93 N. W. 437); *In re Shepard's Estate*, 161 Mich. 441 (126 N. W. 640).

The decree is reversed and one may be entered here dismissing the bills of complaint, with costs of both courts.

McALVAY, BROOKE, BLAIR, and STONE, JJ., concurred.